UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ANIMAL WELFARE INSTITUTE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-08-267-B-W |
| | ) | |
| ROLAND D. MARTIN, | ) | |
| Commissioner of the Maine Department of | ) | |
| Inland Fisheries and Wildlife, | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER ON MOTION FOR PRELIMINARY INJUNCTION
AND MOTION FOR LEAVE TO FILE REBUTTAL DECLARATION
AND SUPPLEMENTAL DECLARATION**

On October 4, 2007, the Court approved a Consent Decree between the Animal Protection Institute and the state of Maine in which the state agreed to impose restrictions on trapping in order to avoid incidental takes of Canada lynx, a threatened species, and to apply for an incidental take permit from the United States Fish and Wildlife Service. The Plaintiffs have filed suit claiming that the restrictions in the Consent Decree have failed to prevent continued incidental takes of lynx and asking the Court to further enjoin trapping in the state of Maine to prevent such takes. The recent take of a lynx in a Conibear trap has revealed an acknowledged gap in the state's regulatory scheme, which the Department of Inland Fisheries and Wildlife has promised to amend by the next trapping season. However, as the regulatory gap presents an immediate risk to lynx during the current trapping season and the state has proffered no reason the regulations cannot be amended on an emergency basis, the Court grants the Plaintiff's motion for preliminary injunction in part to require the state to take immediate action. Because the Plaintiffs have failed to demonstrate irreparable harm and the balance of equities favors the

status quo as regards the remaining claims for relief, the Court denies the remaining demands for relief in the Plaintiffs' motion for preliminary injunction.

## I.     STATEMENT OF FACTS

### A.     Procedural History

On August 11, 2008, the Animal Welfare Institute (AWI) and the Wildlife Alliance of Maine (WAM) filed an action for declaratory and injunctive relief, contending that Roland D. Martin, the Commissioner of the Maine Department of Inland Fisheries and Wildlife (Commissioner) (DIFW) was violating the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.*, by authorizing and allowing trapping activities that "take" Canada lynx, a threatened species. *Compl.* (Docket # 1).  On September 23, 2008, the Plaintiffs moved for a preliminary injunction to prevent the Defendant from authorizing trapping activity during the upcoming trapping season, *Pls.' Mot. for Injunctive Relief* (Docket # 7) (*Pls.' Mot.*), and on October 3, 2008, the Plaintiffs filed an amended complaint, which added new factual allegations.  *First Am. Compl.* (Docket # 9).  On October 10, 2008, the U.S. Sportsmen's Alliance Foundation, Maine Trappers Association, Fur Takers of America, National Trappers' Association, Dana Johnson, Sr., Donald Dudley, and Carl Guay (Trappers) filed an unopposed motion to intervene, which the Court granted on October 14, 2008.  *Unopposed Mot. to Intervene* (Docket # 12); *Order Granting Without Ob. Mot. to Intervene* (Docket # 18).  On October 14, 2008, the Commissioner responded in opposition to the motion for preliminary injunction.  *Def.'s Opp'n to Pl.'s Mot. for Prelim. Injunction* (Docket # 15) (*Def.'s Opp'n*).   On October 15, 2008, the Trappers also responded in opposition.  *Def.-Intervenors' Opp'n to Pls.' Mot. for Prelim. Injunction* (Docket # 23) (*Trappers' Opp'n*).  On October 27, 2008, the Plaintiffs replied.  *Pls.' Consolidated Reply to Def.'s and Def.-Intervenors' Opp'n to Mot. for Injunctive Relief* (Docket # 29) (*Pls.' Reply*).

## B.        The Parties

According to the amended complaint, AWI is "a national, non-profit charitable organization headquartered in Washington[,] D.C. and founded in 1951 to reduce the sum total of pain and fear inflicted on animals by humans." *Am. Compl.* ¶ 5.  AWI has "tens of thousands of members and constituents living throughout the United States, including approximately 174 members and constituents who live in Maine."  *Id.*  WAM is "a non-profit, 501(c)(3) organization with offices located at 96 Harlow St., Suite 355, Bangor, Maine, 04401." *Id.* ¶ 6.  It is "an all volunteer organization dedicated to advocacy for wildlife and representing non-consumptive interests of wildlife in Maine." *Id.*  It has "over 700 members living, working and recreating in Maine as full time residents." *Id.*  As Commissioner of the DIFW, Mr. Martin is responsible for all department actions, "including the promulgation of Maine's trapping regulations and ensuring compliance with federal laws, such as the ESA." *Id.* ¶ 10.  The Intervenors are organizations and individuals who are concerned with or who engage in trapping in Maine.  *Unopposed Mot. to Intervene* at 2-4.

## C.        The Canada Lynx[1]

In the lower forty-eight states, Canada lynx (*Lynx canadinsis*) inhabit both boreal forests and subalpine coniferous forest or northern hardwoods.  *Pls.' Mot.* Attach. 2, *Camilla Fox Aff.* ¶ 20 (Docket # 7-3) (*Fox Aff.*).  The historical range of the species in the contiguous states encompassed the northeastern states, including New York and Pennsylvania, the Great Lakes states, the Rocky Mountains, including Montana, Idaho, Oregon, Utah, and Colorado, and the Cascade Range of Washington and Oregon. *Id.*  As a result of habitat degradation and

---

[1] The parties submitted sworn statements with their memoranda.  The parties agree on some, but not all the salient facts.  In providing this background, the Court has attempted to recite those facts upon which the parties appear to agree and noted where they do not.  In addition, the Court has focused on events subsequent to the Consent Decree dated October 4, 2007.

overexploitation, lynx populations have declined dramatically over the last century and have disappeared completely from portions of their former range. *Id.* ¶ 23. Lynx are highly dependent on the snowshoe hare as their primary prey and their populations generally fluctuate with the ten-year hare population cycle. *Id.* ¶ 22. As of March 24, 2000, the United States Fish and Wildlife Service (USFWS) listed the lynx as a threatened species. 65 Fed. Reg. 16052 (March 24, 2000) (codified at 50 C.F.R. § 17.11).

The Canada lynx has existed in the state of Maine since at least 1833 and was distributed widely within the entire state up to 1912. *Fox Aff.* ¶ 49. Though no longer found in southern Maine, lynx continue to exist in northern Maine. *Id.* The parties dispute the number of Canada lynx within the state of Maine and whether the lynx population is increasing or decreasing. The DIFW estimates that there are currently more than 500 lynx in the state of Maine and claims the lynx population appears to be increasing. *Aff. of Dr. Kenneth Elowe* ¶¶ 4, 5 (Docket # 16) (*Elowe Aff.*). The Plaintiffs say that the DIFW estimated 200 to 500 lynx in 2006 and that USFWS has predicted that the lynx population will decline, because there has been a marked decline in the snowshoe hare population over the last two years. *Fox Aff.* ¶ 50.

When the USFWS proposed adding the Canada lynx as a threatened species, it observed that lynx behavior makes them susceptible to trapping and that lynx are easy to trap. *Fox Aff.* ¶ 29 (quoting 63 Fed. Reg. 37003). Also, the USFWS concluded that trapping mortality for lynx has been shown to be entirely additive, that is in addition to natural mortality, rather than compensatory, that is taking the place of natural mortality.[2] *Id.*

---

[2] The Fox affidavit misquotes the Federal Register by omitting the final phrase of this sentence. To be accurate and complete, the Court has added the final phrase regarding compensatory mortality.

### D.      The Maine Trapping Program

Since 1967, Maine law has made it illegal to intentionally hunt or trap lynx. *Elowe Aff.* ¶ 14. There is no claim here that the state of Maine has authorized or that the Intervenors have engaged in purposeful takes of lynx. The issue is whether lynx have been subject to incidental takes. The regulations define "incidental take" as "any taking otherwise prohibited, if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 50 C.F.R. § 17.3. The incidental takes in this case are incidental to Maine's lawful trapping seasons.

Maine, through the DIFW, allows the trapping of the following species of furbearing animals: beaver, bobcat, coyote, fisher, fox, marten, mink, muskrat, opossum, otter, raccoon, red squirrel, skunk, and weasel.[3] *Elowe Aff.* ¶ 11. For most of these animals, the trapping season is permitted from the beginning of November to the end of December. *Id.* ¶ 15. Early trapping, beginning about two weeks before the regular trapping season, is allowed for fox and coyote, and in certain areas, muskrats may be trapped for one week prior to the regular trapping season. *Id.* ¶¶ 16-17. Maine prohibits all types of traps except ordinary foothold traps,[4] duffer-type foothold traps,[5] killer-type body-gripping traps,[6] cage-type traps,[7] colony-type traps,[8] and snares.[9] *Id.* ¶ 19.

---

[3] The DIFW permits the trapping of bears, but they are not considered furbearing animals for purposes of DIFW regulations. *Elowe Aff.* ¶ 12.
[4] Foothold traps are also referred to as leghold traps. *See Compl.* at 1.
[5] Duffer-type traps are designed primarily to catch raccoons; they hold the animal's foot when the raccoon places its foot into a small hole in the trap. *Elowe Aff.* ¶ 20.
[6] Killer-type traps, such as Conibear traps, have spring-loaded jaws and are designed to kill the animal. *Elowe Aff.* ¶ 20.
[7] Cage-type live traps are cages with spring-loaded doors, which close when the animal enters. *Elowe Aff.* ¶ 20.
[8] Colony-traps are similar to cage-type traps, except they are designed to catch and hold multiple animals. *Elowe Aff.* ¶ 20.
[9] Snares use a loop, wire, or cable to catch an animal's foot or neck and are currently prohibited except to catch beaver and bear. When used to catch beaver, the snare must be set completely underwater. Foot snares may be used to catch bear. There are no reported instances of lynx being caught in beaver or bear snares. *Elowe Aff.* ¶ 21.

The state of Maine is divided into twenty-nine Wildlife Management Districts (WMD). *Id.* ¶ 3. Some DIFW regulations are geographically-based, allowing certain types of trapping in some WMDs and not in others. *Id.* ¶¶ 17-18. The primary lynx range in Maine is in WMDs one through six and eight through eleven. *Id.* ¶ 9.

### E.   The 2007 Consent Decree - *Animal Protection Institute v. Martin*

In 2006, a group called the Animal Protection Institute (API) filed a similar complaint in this Court. *Animal Prot. Inst. v. Martin*, No. 06-128-B-W (D. Me. Oct. 12, 2006) (*API*). API's Complaint was resolved by the issuance of a detailed Consent Decree on October 4, 2007. *API, Consent Decree and Order* (Docket # 134) (*Consent Decree*). The Decree required the Commissioner to impose restrictions on trapping in WMDs 1, 2, 3, 4, 5, 6, 8, 9, 10, and 11. *Id.* ¶ 5. The Decree prohibited the use of all leghold traps "that have an inside jaw spread of more than 5 3/8 inches, except that such traps with an inside jaw spread of more than 5 3/8 inches may be used if they are set so as to be fully or partially covered by water at all times." *Id.* ¶ 5(a). It also required that all leghold traps must be equipped with "at least one chain swivel." *Id.* The Decree prohibited the use of cage traps "which have an opening of more than 13 inches in width or more than 13 inches in height."[10] *Id.* ¶ 5(b). The Decree required the Commissioner to recommend to trappers that they not use "ground foothold traps with an inside jaw spread of more than 5 inches" unless they are equipped with offset jaws. *Id.* ¶ 5(g).

The Decree prohibits:

> the setting, placing and tending of any killer-type trap unless set completely underwater or at least 4 feet above the ground or snow level . . . except that killer-type traps with an inside jaw spread not to exceed 5 inches may be permitted under the following conditions: (1) when set so as to be partially covered by water at all times, or (2) when set under overhanging stream banks, or (3) when used as blind sets.

---

[10] The Decree permitted the use of cage traps for wildlife research and survey activities, for removal of animals causing property damage, and to capture bear. *Consent Decree* ¶ 5(b).

*Id.* ¶ 5(d).  The Commissioner may permit killer-type traps "set at least four feet above ground or snow level."  *Id.* ¶ 5(e).  The Commissioner "shall not permit the use of snares for any purpose other than to catch beaver and bear unless and until the [DIFW] obtains an Incidental Take Permit [(ITP)] explicitly authorizing additional uses of snares."  *Id.* ¶ 5(f).  In addition to mandating that the Commissioner maintain a telephone hotline during trapping season, the Decree requires the Commissioner to rehabilitate any lynx injured by incidental trapping, establish a network of qualified veterinarians and animal rehabilitators to provide care for injured lynx, and investigate and report on each incidental trapping of lynx.  *Id.* ¶ 6.  The Consent Decree is still in effect and there has been no allegation that the Commissioner has violated its terms.

### F.    Events Following the Consent Decree

#### 1.    The Plaintiffs' View

The parties present different versions of what has happened to lynx in Maine following the October 4, 2007 Consent Decree.  The Plaintiffs say that during the 2007 trapping season, even after the Consent Decree was issued, eight lynx were reported trapped in the state of Maine in the twenty-nine day period from October 15 through November 13, 2007.[11]  *Fox Aff.* ¶ 53.  This is equivalent to one lynx trapped every four days during the trapping season.  *Id.* ¶ 53.  Two lynx were trapped in WMDs not covered by the Consent Decree, WMDs 7 and 18.  *Id.* ¶ 54.  The Plaintiffs emphasize that these figures include "reported" takes of lynx and that the DIFW has acknowledged unreported takes of lynx occur and that the numbers may be significant.  *Id.* ¶ 52.

---

[11] The Plaintiffs filed their motion at the beginning of the 2008 trapping season and therefore, their affidavits did not include what happened during the 2008 season.  At oral argument on November 10, 2008, the state conceded that since the beginning of the 2008 season, two additional lynx had been subject to a take from leghold traps.  On November 18, 2008, the state notified the Court that a lynx had been subject to a take from a Conibear trap.  *Letter from Assistant Attorney Gen. Taub to Hon. John A. Woodcock, Jr.* (November 18, 2008) (Docket # 42) (*Taub Letter*).

The Plaintiffs point out that lynx do not observe DIFW WMD boundaries and contend that the trapping of two lynx outside protected districts bolsters their demand for an extension of the provisions of the Consent Decree to additional WMDs.  *Id.* ¶¶ 54-55.

All eight lynx trapped in 2007 were caught in leghold traps.  *Id.* ¶ 58.  Despite the restrictions on the size of leghold traps in the Consent Decree, leghold traps with a jaw spread of 5 3/8 inches or less, including sizes 1.75 and 2, remain legal in the restricted WMD areas and are commonly used to trap coyotes, fox, bobcat, fisher, and marten.  *Id.* ¶ 57.  Six of the eight lynx reported trapped in 2007 were caught in leghold traps with jaw spreads of 5 3/8 inches or less. *Id.* ¶ 58.  At least three of the eight trapped lynx were trapped in leghold traps using drags, which can lead to significant injuries.  *Id.* ¶ 59.  Camilla H. Fox, the Plaintiffs' primary expert, opined that "leghold traps pose a significant hazard to Canada lynx, particularly in land and elevated sets, and should be prohibited – at least within areas of known lynx occurrence.  Padded leghold traps with a jaw spread of 4" or less could be allowed outside of these areas, although such traps still pose a hazard to lynx . . . ." *Id.* ¶ 61.

Focusing on the period after the consent decree, the evidence reveals that no lynx were reported caught in Conibear traps in 2007, and one was killed by a Conibear trap in 2008.  *Id.* ¶¶ 63-65; *Taub Letter*.  Ms. Fox opined that "kill traps such as Conibears, regardless of size and whether set on land or elevated sets, have, and will continue to, incidentally capture, injure and/or kill lynx.  They pose a significant hazard to Canada lynx and should be prohibited throughout the lynx's range to protect the species." *Id.* ¶ 65.

The Plaintiffs contend that DIFW regulations are inadequate to protect the lynx, even after the Consent Decree, and that the DIFW has failed to properly enforce the laws and

regulations that do exist, resulting in the continued incidental take of lynx at rates higher than existed before the Consent Decree. *Id.* ¶¶ 80-86.

### 2.    The Commissioner's Response

The Commissioner starts with a different perception of what the Consent Decree was intended to achieve. Dr. Elowe, the DIFW Director of Resource Management, states that they "were not sure whether these restrictions would reduce the incidence of accidental lynx captures, [but they] expected that the restrictions would reduce the incidence of injuries to lynx that were captured." *Elowe Aff.* ¶ 27. He observes that after the Consent Decree issued, the DIFW promulgated an emergency and then a permanent rule restricting the use of foothold and cage traps in lynx range. *Id.* ¶¶ 28-29. Further, he details DIFW efforts to comply with the letter and spirit of the Consent Decree. *Id.* ¶¶ 30-35. In fact, the DIFW has occasionally gone beyond what the Consent Decree mandates. *Id.* ¶¶ 46-47, 50.

In five of the eight cases in which lynx were accidentally trapped, a DIFW biologist was able to travel to the capture site, chemically immobilize the animal, and carefully examine it for possible injury. *Id.* ¶ 34. Two lynx were uninjured and were immediately released. *Id.* ¶ 37. Of the remaining three, one had a "minor shallow skin laceration less than an eighth of an inch that did not prevent its immediate release. Another lynx had a tiny drop of blood at the bottom of its foot. A third lynx had a small shallow laceration (the size of a pea) on the top of its foot. In all three cases, the lynx were immediately released." *Id.* ¶ 35. One lynx had a "<u>very</u> slight limp that likely would have gone unnoticed had someone not known that it was a trapped animal." *Id.* ¶ 36 (emphasis in original incident report). After reviewing state records of trapped lynx, which were released, and their survival rate, Dr. Elowe concluded that "even when caught accidentally

by private trappers, the impact caused by the trapping does not appear to affect post-capture survival." *Id.* ¶ 65.

Dr. Elowe vigorously disputed the Plaintiffs' contention that incidental trapping of lynx could adversely affect the lynx population in Maine. *Id.* ¶ 87. He explained that "[t]he analysis [DIFW] performed for our ITP application, using modeling techniques reviewed and approved by USFWS, shows that this is simply not true. For the most part, lynx caught in foothold traps are released without significant injuries, so the trapping event has no effect on the population." *Id.* ¶ 87. Finally, he states that "[s]ince 1999, only two lynx have been killed by traps, and both were killed in 2005 by killer-type traps. Given the new restrictions on killer-type traps, it is unlikely that lynx will be caught in the future by such traps." *Id.* ¶ 88.

### 3.    The Trappers' Response

The Trappers presented the views of Craig McLaughlin, Ph.D., who holds a doctorate in Wildlife Ecology and is employed as Wildlife Program Chief for the state of Utah Division of Wildlife Resources, and Dana R. Johnson, Sr., President of the Maine Trappers Association. *Decl. of Dana Johnson* (Docket # 22) (*Johnson Decl.*); *Decl. of Craig McLaughlin* (Docket # 24) (*McLaughlin Decl.*)

Mr. Johnson states that to limit leghold traps, as the Plaintiffs propose, in WMD 1-11 and 18 "would eliminate much of the land-based trapping in Northern and Central Maine," and to restrict Conibear traps to four inches or less "would eliminate almost all of the remaining land-based trapping."[12] *Johnson Decl.* ¶ 4. The current maximum jaw spread for leghold traps of 5 3/8 inches is "at or just above the minimum width that will allow for the trapping of coyote in

---

[12] Mr. Johnson explains that although cage-traps would still be legal, they are not a practical substitute for leghold and Conibear traps, due to three factors: (1) their size makes them difficult to transport over rugged terrain to remote locations; (2) foxes and coyotes will almost never enter a cage trap; and, (3) they are cost-prohibitive. *Johnson Decl.* ¶ 4 n.1.

foothold traps." *Id.* ¶ 5.  As regards other species, some were previously trapped by using baited Conibear traps set on the ground, but the Consent Decree prohibited this practice, and trappers must now rely primarily on leghold traps to trap weasels, fox, and raccoons.  *Id.* ¶ 6.  The Consent Decree authorizes the use of Conibear traps off the ground on poles, which allows the trapping of fisher and marten.  *Id.*¶ 8.  However, if Conibear traps are further restricted by the four inch maximum proposed by the Plaintiffs, Mr. Johnson says "they cannot be used effectively to catch fisher and marten . . . [and] [f]ew if any species (perhaps squirrel) could be caught in conibear traps that are 4 inches or less across."  *Id.*  Mr. Johnson predicts "a huge adverse impact on farmers and other property owners" if the Plaintiffs' proposals are enforced, since trapping reduces species, such as coyotes, fox, mink, fisher, skunks, and raccoons, that prey on livestock, poultry, and small domestic animals, and species, such as raccoons, skunks, porcupines, and woodchucks, that destroy crops.  *Id.* ¶ 9.  Among other adverse impacts, he predicts that the loss of revenue to the trappers "will exceed a quarter of a million dollars."  *Id.* ¶ 11.

Dr. McLaughlin explains that the Consent Decree restrictions effectively reduce the likelihood that leghold traps will accidentally take lynx.  Dr. McLaughlin is familiar with the terms of the Consent Decree and observed that the restriction against leghold traps with a jaw spread greater than 5 3/8 inches makes it less likely that lynx will become trapped, because lynx have relatively large feet, although he acknowledges it is possible for lynx to be trapped in the smaller leghold traps.  *Id.* ¶ 6.  He also noted that the additional requirements regarding Conibear traps are designed to limit their accessibility and attractiveness to lynx.  *Id.* ¶ 7.  Under the Consent Decree, Conibear traps must be located on a narrow leaning pole at least four feet above ground or snow level (lynx will not climb the pole), or placed without bait on the ground (lynx

will not be attracted to the trap without bait), or in stream banks near water (lynx are unlikely to venture near stream beds). *Id.*

Second, Dr. McLaughlin explores the adverse consequences to the lynx if the Plaintiffs' proposals are ordered. Dr. McLaughlin points out that leghold traps of 5 3/8 inch are "just big enough to permit trapping for coyote, and also permit[] trapping of bobcat, fisher, and other predators such as marten and red fox. There [are] no effective alternative trap types to catch coyote, bobcat or most other predators that [are] legally allowed in Maine." *Id.* ¶ 8. Regarding the Conibear traps, he states that if the proposed four inch maximum jaw spread is adopted, they will be too small to catch fisher. *Id.* Currently, trappers help control the population of these predators generally and specifically when competition for the snowshoe hare is most acute. *Id.* ¶ 11.

Dr. McLaughlin observed that "[o]ne of the remarkable characteristics of lynx is their extremely high dependence on snowshoe hare, which constitutes the vast majority of the lynx diet." *Id.* ¶ 12. Lynx, coyotes, bobcat, and fisher all compete for the same snowshoe hares. *Id.* ¶¶ 13, 15-16. Finally, fisher, and to a lesser extent coyote, prey on lynx. *Id.* ¶ 18. A decrease in trapping these predators, in Dr. McLaughlin's opinion, would harm the lynx by increasing competition for their sole food source and increasing the numbers of animals for whom the lynx itself is a food source. *Id.* ¶ 20. Balancing the benefits and detriment to the lynx from the imposition of the additional restrictions proposed by the Plaintiffs results, in Dr. McLaughlin's view, in a net detriment to the lynx. *Id.* ¶ 23.

### 4. The Plaintiffs' Reply

In their reply, after disputing the legal grounds for the posited defenses, Plaintiffs reassert that the balancing analysis favors the injunctive relief they are seeking, accuse the DIFW and the

Trappers of manipulating statistics and contradicting their own data, and diminish the claimed economic impact of enhanced restrictions by saying that trapping in Maine is "a recreational activity that is not economically viable." *Pls.' Reply* at 16-21.

> **5.    Trappers' Motion for Leave to Submit Rebuttal and Supplemental Declarations**

On Friday, November 7, 2008, one business day prior to oral argument in this matter, the Trappers filed a motion for leave to file rebuttal and supplemental declarations. *Def.-Intervenors' Expedited Mot. for Leave to Submit Rebuttal Decl. and Supplemental Decl. in Opp'n to Pls. Mot. for Prelim. Inj.* (Docket # 36) (*Trappers' Mot. for Leave*).   The Plaintiffs objected.   *Pls' Resp. to Def.-Intervenors' Expedited Mot. for Leave to File Rebuttal Decl. and Supplemental Decl. in Opp'n to Pls' Mot for Prelim. Inj.* (Docket # 39).

The Trappers' seek to introduce two new declarations, from Gerald Lavigne and Craig McLaughlin. *Trappers' Mot. for Leave* at 2.  Mr. Lavigne is the author of an article discussed by Plaintiffs' witness Camilla Fox in her second declaration. *Id.*   The stated purpose of his declaration is to allow Mr. Lavigne to "explain that[] Ms. Fox is misreading the article and reaching the wrong conclusion." *Id.*   Dr. McLaughlin already provided a declaration in connection with the Trappers' response to Plaintiffs' motion for preliminary injunction. *McLaughlin Decl.*   Now, the Trappers seek to introduce a second declaration from Dr. McLaughlin in which he adds "citations and quotations to the professional literature in Maine to the citations he offers in his original declaration." *Trappers' Mot. for Leave* at 2.  The Trappers' readily acknowledge that "[n]o new points are raised." *Id.*

Although the Trappers' do not identify it as such, their motion is in effect a request to file a surreply.  A surreply is appropriate where a party has not had the opportunity to contest matters introduced for the first time in the opposing party's reply. *See United States ex rel. Pogue v.*

13

*Diabetes Treatment Ctrs. of Am., Inc.*, 238 F. Supp. 2d 270, 276-77 (D.D.C. 2002) ("The standard for granting leave to file a surreply is whether the party making the motion would be unable to contest matters presented to the court for the first time in the opposing party's reply. The matter must be truly new." (internal citation and quotation omitted)).  Here, the Trappers' make no claim that the Plaintiffs' raised new matters in their reply, nor that they have lacked the opportunity to address Plaintiffs' arguments.  Accordingly, the Court will not consider the Trapper's rebuttal and supplemental declarations in ruling on Plaintiffs' motion for preliminary injunction.[13]

### G.  The November 17, 2008 Conibear Trap Take

On November 18, 2008, the DIFW, through its attorney, informed the Court that, although he had represented at oral argument that two additional lynx had been caught by trappers during the 2008 season, a third lynx had been caught in a Conibear trap and had died:

> On November 17, 2008, a trapper advised the [DIFW] that he had captured a lynx.  State and federal officials responded to the scene and are currently investigating the matter, and I have only limited details at this time.  It is my understanding though, that the lynx was captured in a Number 160 Conibear trap in [WMD] 2.  The trapper discovered the lynx when he tended the trap on November 17.  He had last tended the trap five days previously.  Accordingly, the lynx was captured and died sometime within that five day period.

*Taub Letter*.

Following receipt of the letter, the Court held a telephone conference of counsel on November 20, 2008.  The status of the governmental investigations was discussed, and the Court was advised that the state investigation was complete and the federal investigation, though not

---

[13] The Trappers' contend that under Fed. R. Civ. P. 6(c)(2) it is possible that they may be "entitled as of right to file declarations one business day before the scheduled hearing." *Trappers' Mot. for Leave* at 2.  Other than the Rule, the Trappers' cite no authority for this conclusion, nor is the Court aware of any.  The language of Rule 6(c)(2) requires that "any opposing affidavit must be served at least 1 business day before the hearing, unless the court permits service at another time."  The deadline in the Rule does not imply that affidavits may be submitted as a matter of right until that deadline.

complete, might be completed by the end of the week.  If not, the state would likely be aware by then what the federal investigation revealed.  Accordingly, the Court ordered that the state file a final investigative report by noon on Monday, November 24, 2008 and allowed the parties one hour to file any objections to its contents.  *Minute Entry* (Docket # 44).

On November 24, 2008, the Court received a flurry of filings.  The state filed a second affidavit from Dr. Elowe together with a lynx capture report, which was supplemented by additional attachments.  *Second Aff. of Dr. Kenneth D. Elowe* (Docket # 45) (*Second Elowe Aff.*); *Lynx Incidental Capture Report* Ex. A (Docket # 45-2) (*Lynx Report*); *Attachs. To Ex. A. to Second Aff.* (Docket # 47).  The Trappers filed a supplemental memorandum, an affidavit from Dana Johnson, the President of the Maine Trappers' Association, and an additional attachment. *Supplemental Mem. Regarding Def.-Intervenors' Opp'n to Pls.' Mot. for Preliminary Injunction* (Docket # 46) (*Trappers' Supplemental Mem.*); *Second Decl. of Dana Johnson* (Docket # 49) (*Second Johnson Decl.*); *Additional Attach.* (Docket # 51).  The Plaintiffs filed a response.  *Resp. to Def.'s Supplemental Aff.* (Docket # 50) (*Pls.' Supplemental Resp.*).

The report of the lynx trapping on November 17, 2008 reveals that the trapper called in a report of a dead lynx on November 17.  *Lynx Report* at 1.  He had last tended the trap on November 12. *Taub Letter*.  The trap was set four feet nine inches from the ground on a tree that measured three and one-half inches.  *Lynx Report* at 1.  The tree had a "natural bend and ranged from 25 degrees at ground level to 78 degrees at the trap location."  *Id*.  The trap was set less than six inches from two large diameter cedars and less than four inches from a down tree that ran beneath the trap.  *Id.* at 1-2. The DIFW concluded that the trap was set in technical violation of the regulations, because the tree on which the trap had been placed did not reach the requisite forty-five degree angle until twenty-five inches from the ground or thirty-six inches from the

base of the tree. *Id.* at 2. The DIFW further concluded, however, that the trapper demonstrated no intent to violate the rule and determined not to issue a citation. *Id.*

The report contains a highly disturbing photograph of the dead lynx. The photograph shows the lynx standing on its hind legs, fully stretched and facing a large cedar with its right front paw raised straight up over its head and caught in a trap. The photograph suggests that the lynx climbed either the smaller tree where the trap was located or the cedar, caught its paw in the trap, and fell to the ground trying to escape. Though not mentioned in the report, presumably the lynx died either of starvation or exposure between November 12 when the trap was last checked, and November 17, when the animal was found dead.

Dr. Elowe opined that the Conibear trap in this case was set in violation of current Maine regulations, because "the tree or pole on which the trap is affixed must be at an angle of at least 45 degrees to the ground at all points between the ground and the point at which the trap is affixed." *Second Elowe Aff.* ¶ 7. He said that it is "impossible to determine with certainty whether the lynx accessed the trap by climbing up the tree on which the trap is affixed, or by climbing up the large cedar tree immediately adjacent to the trap and then reaching across approximately five inches into the trap." *Id.* ¶ 8. He thought that "[b]ased on all available evidence, we believe it is more likely that the lynx accessed the trap via the large cedar tree adjacent to the trap, and not by climbing the tree on which the trap is affixed." *Id.* ¶ 9.

Dr. Elowe said that based on the recent incident, the rule needs to be modified in two respects: (1) "the rule needs to be clarified to explicitly state that the tree or pole on which the trap is affixed must be at an angle of at least 45 degrees to the ground at all points between the ground and the point at which the trap is affixed;" and, (2) "the rule needs to be amended to address not only the types of trees and poles on which killer-type traps may be set, but also must

16

address the extent to which traps may be set adjacent to trees and other objects which might allow a lynx to access the trap." *Id.* ¶¶ 11-12.  He expected that the "two amendments to the killer-type trap rule will be adopted and will take effect prior to the start of next year's trapping season." *Id.* ¶ 13.

The Trappers agree that this recent incident has "revealed that the regulation is not as tight and specific as it is intended to be and that a change is appropriate to prevent a recurrence of another similar incident." *Trappers' Supplemental Mem.* at 1.  The Trappers nevertheless "urge the Court to afford the State the opportunity to further modify and tighten its regulations rather than issue the preliminary injunction sought by Plaintiffs." *Id.*  The Trappers also submitted an affidavit from Dana Johnson.  Mr. Johnson confirmed that lynx are able to climb large trees, but not "narrow objects that are at a 45-degree angle or steeper." *Second Johnson Decl.* ¶ 2.  He said that although we will never know exactly what happened, it "is almost a certainty that the lynx climbed the wide tree, reached across to the small, narrow tree and was caught by the foot in the conibear trap." *Id.* ¶ 3.  Mr. Johnson proposed that the rule be amended to "require that there be no trees, poles, or other objects greater than 4 inches in diameter within lynx reaching distance of the tree or pole in which the trap is set" and suggested "a minimum distance of four feet." *Id.* ¶ 6.

The Plaintiffs point out that the state's proposal to alter the current regulations will not take effect until next trapping season, which is in their view "not adequate to protect lynx during this trapping season." *Pls.' Supplemental Resp.* ¶ 1.  They note that neither the state nor the Trappers mentioned the trapper check time of five days, which though legal under current regulations, the Plaintiffs have argued was too long "for trappers to find and release non-target animals alive." *Id.* ¶ 2.  Finally, they point out a discrepancy between Dr. Elowe's affidavit and

the incident report about whether the lynx accessed the trap by climbing the smaller tree where the trap was located or the larger nearby cedar.  *Id.* ¶ 3.

### H.    The Legal Positions

#### 1.    The Complaint and Motion for Preliminary Injunction

The Plaintiffs claim that (1) Canada lynx "have been, and will continue to be, trapped in leghold traps as well as within [WMDs] that are not covered by the consent decree"; (2) the number of lynx trapped in leghold traps "rose subsequent to, and in spite of, the consent decree"; and, (3) "[m]ore trapped lynx were reported in the one month period after the consent decree was entered into and trap restrictions were put in place than during the entire trapping seasons over the previous two years."  *First Am. Compl.* ¶ 2.  The Plaintiffs say that the Commissioner has been and is violating the ESA and they request an order enjoining "these ongoing violations of federal law."  *Id.*.  Though the lawsuit itself is broadly phrased, the Plaintiffs' demand for a preliminary injunction seeks a specific set of remedies:

1. Require the state of Maine to submit a completed habitat conservation plan to the USFWS for application of an ITP;
2. Prohibit the use of leghold traps used on land (both ground and elevated sets) in the identified lynx WMDs (1-6 and 8-11) as well as the two WMDs where lynx were trapped in 2007 (7 and 18); and,
3. In the same WMDs, prohibit the use of killer-type traps with an opening of more than four inches in both ground and elevated sets.

*Pls.' Mem. in Support of Mot. for Injunctive Relief* at 27 (Docket # 7-2) (*Pls.' Mem.*).

#### 2.    The Commissioner's Defense

The Commissioner responds variously.  He observes that the state of Maine has filed an application with the USFWS for an ITP and he urges the Court to stay this action until the USFWS has acted on the state's application.  *Def.'s Opp'n* at 7-8.  Next, he urges the Court to deny the motion because (1) the Plaintiffs delayed seeking relief; (2) the Plaintiffs are not likely

to prevail on the merits because of the doctrine of claim preclusion and the absence of any state violation of the ESA; and, (3) any relief should be limited to an order requiring continuing compliance with the Consent Decree. *Id.* at 8-27.

### 3.    The Trappers' Input

"Words cannot describe the frustration felt by the trappers in making substantial concessions to API to obtain a consent decree settlement, only to see two organizations spearheaded by the same underlying individuals (Camilla Fox and Daryl De[J]oy) file an essentially identical lawsuit trying to bypass that settlement." *Trappers' Opp'n* at 2.  In addition to supporting the state of Maine's positions in defense of this lawsuit, the Trappers dispute the need for any regulations more stringent than those in the Consent Decree and contend that banning foothold trapping and effectively banning Conibear trapping in northern and central Maine would hurt, not help the lynx, because it would increase their natural competitors, such as coyote, bobcat, and fisher.  *Id.* at 2-3.  They also propose that trapping provides significant public and private benefits, including income to trappers, fur for clothing, and protection for livestock and property.  *Id.* at 3.

### 4.    The Plaintiffs' Reply

The Plaintiffs reply by contending that the filing of a draft ITP application is not enough to support a stay, that a stay would be contrary to congressional intent, and that the Commissioner has failed to demonstrate hardship justifying the stay.  *Pls.' Reply* at 1-3.  Second, they say that laches should not bar their claim, because laches must be invoked sparingly in environmental actions and the Commissioner has not met the essential elements for laches.  *Id.* at 3-8.  Further, they argue that the Commissioner has unclean hands.  *Id.* at 4-6.  The Plaintiffs object to the application of the claim preclusion, emphasizing that they were not parties to the

earlier litigation, and the case does not fit within any exceptions to this requirement.  *Id.* at 9-14.

They reassert that the Commissioner has violated the ESA.  *Id.* at 14-16.  Finally, turning to the

requirements for injunctive relief, they say they have demonstrated irreparable harm, the balance

of harm weighs in their favor, and the Tenth Amendment does not prohibit such an injunction.

*Id.* at 16-22.

I.      **The Minnesota Lynx Case:**  *Animal Protection Institute v. Holsten*[14]

In the hiatus between the Consent Decree and the initiation of this lawsuit, a remarkably

similar cause of action has been pending in the United States District Court in Minnesota.  In

*Animal Protection Institute v. Holsten*, the API along with a separate co-plaintiff sued the

Commissioner of the Minnesota Department of Natural Resources, alleging that the state had

violated § 9 of the ESA "by authorizing and allowing trapping and snaring activities that 'take'

Canada Lynx, which is listed as protected under the ESA."  541 F. Supp. 2d at 1075.  The

Plaintiffs sought declaratory and injunctive relief.  *Id.*  As in Maine, the state of Minnesota had

promised to file an application for an ITP with the USFWS.  *Id.* at 1076.  On March 28, 2008,

rejecting the state's arguments, United States District Judge Davis granted the Plaintiffs' motion

for summary judgment and found the Commissioner "has violated and remains in violation of

Section 9 of the [ESA] by authorizing trapping and snaring within the range of Canada Lynx in

Minnesota."  *Id.* at 1081.  He granted the motion for injunctive relief and ordered the state to

> promptly take all action necessary to insure no further taking of threatened
> Canada Lynx by trapping or snaring activities within the core Canada Lynx
> ranges, including, but not limited to:  applying for an incidental take permit for
> Canada Lynx on or before April 30, 2008 . . ., and developing and preparing a
> proposal . . . to restrict, modify or eliminate . . . the incidental taking of Canada
> Lynx through trapping activities in the core Canada Lynx ranges.

---

[14] 541 F. Supp. 2d 1073 (D. Minn. 2008).

*Id.* Following the Order, the state submitted a proposal to restrict, modify, or eliminate the incidental take of Canada lynx by, *inter alia*, restricting the use of Conibear and leghold traps, limiting the size of snares, and banning the use of certain types of bait. *Def.'s Opp'n* Attach. 12, *Proposal of the Minnesota Department of Natural Resources to Restrict, Modify, or Eliminate the Incidental Take of Canada Lynx* at 4-6 (*Minn. Proposal*). The proposal imposed no size restrictions on foothold traps. *Id.* After considering an objection to the state's proposal, the Court approved its terms with minor modification and ordered them to remain in effect until the USFWS issues an ITP, the USFWS promulgates a § 4(d) Rule, the Canada lynx is removed from protection under the ESA, or further order of the Court. *Animal Prot. Inst. v. Holsten*, Civil No. 06-3776 (MJD/RLE), 2008 U.S. Dist. LEXIS 53396, at *3-4 (D. Minn. July 14, 2008) (*Minn. Order*).

## II.    DISCUSSION

### A.    Jurisdiction

The Plaintiffs initiated this cause of action under the ESA, alleging that "by authorizing and allowing trapping activities that 'take' . . . Canada lynx," the state of Maine is violating the Act. *Compl.* ¶ 4. Congress granted jurisdiction to the "several district courts of the United States" . . . "over any actions arising under [the ESA]." 16 U.S.C. § 1540(c). The ESA further allows "any person" to "commence a civil suit on his own behalf . . . to enjoin any person, including . . . any . . . governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this Act or regulation issued under the authority thereof." 16 U.S.C. § 1540(g)(1)(A).

### B.      Criteria for Injunctive Relief

The Court analyzes a request for a preliminary injunction through application of the

following four well-established factors:

> '(1) the likelihood of success on the merits;
> (2) the potential for irreparable harm [to the movant] if the injunction is denied;
> (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if
> enjoined as contrasted with the hardship to the movant if no injunction issues; and
> (4) the effect (if any) of the ruling on the public interest.'

*Esso Standard Oil Co. v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006) (quoting *Bl(a)ck Tea

Soc'y v. City of Boston*, 378 F.3d 8, 11 (1st Cir. 2004)).   The party seeking relief bears the

burden of demonstrating that these factors weigh in its favor.   *Nieves-Marquez v. Puerto Rico*,

353 F.3d 108, 120 (1st Cir. 2003).   A preliminary injunction is "an extraordinary remedy never

awarded as of right."   *Winter v. Natural Res. Def. Council, Inc.*, No. 07-1239, 2008 U.S. LEXIS

8343, at *30 (U.S. Nov. 12, 2008).   A judge should exercise the authority to grant such

injunctive relief "sparingly".   *Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency &

Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

### C.      The ESA

The Endangered Species Act of 1973 "represented the most comprehensive legislation

for the preservation of endangered species ever enacted by any nation."   *Tenn. Valley Auth. v.

Hill*, 437 U.S. 153, 180 (1978) (*TVA*).   The stated purposes of the Act were "'to provide a means

whereby the ecosystems upon which endangered species and threatened species depend may be

conserved,' and 'to provide a program for the conservation of such . . . species . . . .'"   *Id.*

(quoting 16 U.S.C. § 1531(b)).   Congress found that "various species of fish, wildlife, and plants

in the United States have been rendered extinct as a consequence of economic growth and

development untempered by adequate concern and conservation," while other species "have been

so depleted in numbers that they are in danger of or threatened with extinction."  16 U.S.C. §

1531(a)(1)-(2); *Maine v. Norton*, 257 F. Supp. 2d 357, 362 (D. Me. 2003).  The Supreme Court

has observed that "the seriousness with which Congress viewed this issue" is reflected in the

ESA's provisions:  "Virtually all dealings with endangered species, including taking, possession,

transportation, and sale, were prohibited, except in extremely narrow circumstances."  *TVA*, 437

U.S. at 180 (citations omitted).  In *TVA*, the Supreme Court also noted that "[t]he plain intent of

Congress in enacting this statute was to halt and reverse the trend toward species extinction,

whatever the cost."  *Id.* at 184.

### D.   Claim Preclusion

The DIFW and the Trappers are frustrated and suspicious.  They have observed the

striking similarity between the Plaintiff and individuals involved in the 2006 litigation, which led

to the issuance of the Consent Decree, and the Plaintiffs and individuals involved in this

litigation.  They protest that in entering into the Consent Decree in 2007, the DIFW and the

Trappers made substantial concessions in good faith and thought they had an agreement that

would bridge the interval until the USFWS acted on the anticipated application for an ITP.  Yet,

with the application filed and awaiting action by the USFWS, they are now required to defend a

new action, which raises the same issues under the same legal theories in the same forum with

the same principal defendant and similar Plaintiffs.  The DIFW and the Trappers cry foul and

urge this Court to dismiss the lawsuit under the doctrine of claim preclusion, arguing that the

pending lawsuit is barred by the Consent Decree in the prior API lawsuit.

### 1.   The Prime Movers of the Lawsuits

The Plaintiff in the 2006 lawsuit was Animal Protection Institute.  *API*, *Compl.* at 1

(Docket # 1).  In the Complaint, API described itself as follows:

> The Plaintiff, Animal Protection Institute . . ., is a California corporation, with its principal place of business located at 1122 S Street in Sacramento, California. API is a national, non-profit organization dedicated to advocating for the protection of animals from cruelty and exploitation. API brings this action on behalf of itself and its adversely-affected members. API has tens of thousands of members and supporters living throughout the country. Approximately 248 of API's members live in Maine.

*Id.* ¶ 2. The Plaintiffs in this lawsuit are Animal *Welfare* Institute and Wildlife Alliance of Maine. *First Am. Compl.* ¶¶ 5-6. AWI describes itself as follows:

> Plaintiff, ANIMAL WELFARE INSTITUTE . . . is a national, non-profit charitable organization headquartered in Washington[,] D.C. and founded in 1951 to reduce the sum total of pain and fear inflicted on animals by humans. AWI brings this action on behalf of itself, its board of directors, and its adversely affected members. AWI has tens of thousands of members and constituents living throughout the United States, including approximately 174 members and constituents who live in Maine.

*First Am. Compl.* ¶ 5. WAM describes itself as follows:

> Plaintiff, Wildlife Alliance of Maine . . . is a non-profit, 501(c)(3) organization with offices located at 96 Harlow St., Suite 355, Bangor, Maine 04401. WAM is an all volunteer organization dedicated to advocacy for wildlife and representing non-consumptive interests of wildlife in Maine. WAM brings this action on behalf of itself and its adversely-affected members. WAM has over 700 members living, working and recreating in Maine as full time residents.

*Id.* ¶ 6. Behind these three entities, the DIFW and the Trappers see many of the same people, but in particular they focus on two people as the prime movers: Daryl DeJoy and Camilla Fox. *Trappers' Opp'n* at 2 (stating "two organizations spearheaded by the same underlying individuals (Camilla Fox and Daryl Dejoy) file an essentially identical lawsuit trying to bypass that settlement"); *Def.'s Opp'n* at 13 (stating "the two individuals who apparently spearheaded the API lawsuit are spearheading this one"). The DIFW notes that while at API, Ms. Fox was involved in the decision to initiate the 2006 litigation. *Def.'s Opp'n* Attach. 9, *Dep. of Camilla Fox* at 198:9-19. She was a proposed expert witness in the 2006 litigation and is serving as an expert witness in this litigation. *Def.'s Opp'n* at 13. Mr. DeJoy submitted declarations in the

24

API case and attended a deposition, and he is the Executive Director of WAM, the co-Plaintiff in this litigation. *Def.'s Opp'n* Attach. 3, 4, 10. The Trappers thought the two were married. *Trappers' Opp'n* at 2.

### 2. The Plaintiffs' Response

Mr. DeJoy and Ms. Fox acknowledge much of what the DIFW and the Trappers contend is true about their involvement with the two lawsuits. Mr. DeJoy is Executive Director and founder of WAM and filed a declaration in support of API's 2006 litigation. *Pls.' Reply* Attach 4, *Decl. of Daryl DeJoy* ¶¶ 1, 5 (*DeJoy Decl.*). Ms. Fox served in various positions at API, including National Campaign Director and Director of Wildlife Programs, from November 1996 through November 2006. *Pls.' Reply* Attach 1, *Second Decl. of Camilla Fox* ¶ 2 (*Second Fox Decl.*). While at API, she was involved in API's decision to initiate the 2006 lawsuit. She served as an expert witness in the API case and is serving as an expert in this case. *Id.* ¶ 7. Though not married, Mr. DeJoy and Ms. Fox are partners. *Id.* ¶ 16.

But, the Plaintiffs present other evidence that supports their claim that API and the current Plaintiffs are independent organizations, which made separate and independent decisions about these lawsuits. API was founded in 1968 and is based in Sacramento, California; its "primary campaign areas currently include animals used in entertainment, captive exotic animals, trapping & fur, and the international wildlife trade." *Second Fox Decl.* ¶ 2. AWI was founded in 1951 and is based in Washington, D.C.; its general mission is to "reduce the sum total of pain and fear inflicted on animals by humans" and, more specifically, one of its major efforts is "to end the torture inflicted on furbearing animals by steel jaw leghold traps and wire snares . . . ." *Id.* ¶ 8. Although the Plaintiffs did not provide further detail about WAM, the Amended Complaint alleges that it is a non-profit, 501(c)(3) organization with offices headquartered in

Bangor, Maine; its general mission is "advocacy for wildlife and representing non-consumptive interests of wildlife in Maine." *First Am. Compl.* ¶ 6; *see DeJoy Decl.* ¶ 2.

Regarding Ms. Fox's involvement in these three organizations, her Second Declaration clarifies that, although she was working for API when the 2006 lawsuit was initiated and participated in the decision to initiate the lawsuit, she left employment with API in November 2006. *Second Fox Decl.* ¶ 4.   In April 2007, she was contacted by Attorney Jay Tuchton, the Director of the University of Denver Environmental Law Clinic at the time, who was lead counsel for API in the 2006 case, and he asked her to serve as an expert witness in the case. *Id.* ¶ 7.   She agreed and was deposed on June 12, 2007. *Id.*   However, she was not in charge of the case. *Id.*   Ms. Fox now serves as a wildlife consultant for AWI and has agreed to serve as an expert witness in this case. *Id.* ¶¶ 8-9.   She says that AWI decided to join WAM in this lawsuit because (1) eight lynx were trapped during the 2007 season in Maine after the Consent Decree was issued; (2) an October 23, 2007 letter from USFWS to DIFW rejected its incidental take permit application and recommended a number of regulations to further protect the lynx; (3) it became evident that the DIFW was not going to file a compliant ITP application with USFWS; and, (4) the Minnesota district court had decided *Animal Protection Institute v. Holsten.  Id.* ¶¶ 11-15.

Mr. DeJoy clarified that, although he is a member of a number of environmental organizations, he is no longer a member of API. *DeJoy Decl.* ¶ 3.   He states he was asked to be a declarant in API's 2006 case, but he "was not asked, and did not, represent WAM in the previous case and API did not believe it was representing WAM." *Id.* ¶ 5.   He says that he "did not spearhead the previous litigation, was not in charge of the lawsuit and had no say whatsoever in any decision-making nor any control or say in the final Consent Decree." *Id.*   The reasons WAM

26

elected to initiate this lawsuit essentially echo the reasons Ms. Fox gave for AWI's decision to do the same. *Id.* ¶¶ 6-10.

### 3.    The Consent Decree and Claim Preclusion

The premise of the Defendants' claim preclusion argument is that API would be barred under the terms of the Consent Decree from initiating this cause of action, since if API is not precluded from initiating this cause of action, subsequent parties like AWI and WAM would certainly not be precluded.  The Court is dubious.  The Consent Decree contains the following provision:

### VI.  ENFORCEMENT

11.  The Court shall retain jurisdiction of this case under 16 U.S.C. § 1540(g) until the termination of the Decree in order to enforce the terms and conditions of the Decree, to modify or terminate the Decree for good cause shown, and to resolve any disputes arising hereunder.

*Consent Decree* ¶ 11.  The statutory reference in this paragraph is to the provision of the ESA that authorizes the initiation of citizen suits and provides for a range of remedies, including injunction.  16 U.S.C. § 1540(g).  From the Court's perspective, API would not be barred under the Consent Decree from moving to modify the Decree, alleging that the continued takes of lynx both in areas covered and not covered by the Decree, constitute "good cause" for the modification.  In fact, there is nothing in the Consent Decree that would prevent API from initiating a separate cause of action, alleging what is being alleged here:  developments subsequent to the Consent Decree require new restrictions.  While such a lawsuit may have run contrary to the spirit of the Consent Decree, it would not be prohibited by its provisions.  This being the case, the Defendants' complaints about collusion among API, AWI, and WAM ring hollow.

### 4.    Legal Standard

Nevertheless, the Court will explore whether—assuming, as the parties have, that API could not bring this cause of action—AWI and WAM would be estopped from doing do so under the doctrine of claim preclusion.  Just this year in *Taylor v. Sturgell*, __U.S.__, 128 S. Ct. 2161 (2008), the United States Supreme Court extensively addressed claim preclusion.  *Taylor* noted that "[t]he preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'"  128 S. Ct. at 2171.  "Under the doctrine of claim preclusion, a final judgment forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'"  *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)).   "The essential elements of claim preclusion are: (1) a final judgment on the merits in an earlier action; (2) an identity of parties or privies in the two suits; and (3) an identity of the cause of action in both suits."  *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 30 (1st Cir. 1994).  Precluding parties from relitigating matters "protects their adversaries from the expense and vexation attending multiple suits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153-54 (1979).  A consent decree is generally given the same effect for claim preclusion purposes as a litigated judgment.  *See In re Medomak Canning*, 922 F.2d 895, 900 (1st Cir. 1990); *Rufo v. Inmates of Suffolk County Jail*, 502 U.S. 367, 378 (1992) (noting that consent decrees are "subject to the rules generally applicable to other judgments and decrees").  "Claim preclusion, like issue preclusion, is an affirmative defense."  *Taylor v. Sturgell*, 128 S. Ct. at 2179.  "[I]t is incumbent on the defendant to plead and prove such a defense."  *Id.* at 2179-80.  The Plaintiffs concede that the first element—a final judgment on the merits in *Animal Protection Institute v. Martin*—is

satisfied.  *Pls.' Reply* at 9 (stating that "[c]ontrary to defendant's assertion, neither the second or third elements are met").

### 5.   Identity of Parties or Privies

#### a.   *Taylor* Exceptions, the API Lawsuit, and the Instant Case

In general, "one is not bound by a judgment *in personam* in a litigation in which he is not designated as a party."  *Hansberry v. Lee*, 311 U.S. 32, 40 (1940).  There are, however, several exceptions to this rule.  *Taylor*, 128 S. Ct. at 2172.  In *Taylor*, the Supreme Court grouped these exceptions into six categories:  (1) where a person agrees to be bound by the determination of issues in an action between others;  (2) where there exists a pre-existing substantive legal relationship between the party to be bound and a party to the judgment;  (3) in certain limited circumstances where a nonparty was adequately represented by someone with the same interests who was a party to the suit;  (4) where a nonparty assumed control over the litigation in which that judgment was rendered;  (5) where the nonparty is acting as a proxy for a party to the first lawsuit;  or (6) where a special statutory scheme expressly forecloses successive litigation by nonlitigants.  *Taylor*, 128 S. Ct. at 2172-73.

Defendants concede that AWI and WAM were not parties to the API case, instead arguing that one or more of the *Taylor* exceptions may apply to bar Plaintiffs' suit.  *Def.'s Opp'n* at 12.  Specifically, Defendants contend that the second, third, fourth, or fifth exceptions may apply.[15]  *Id.*  In support of their contentions, Defendants identify four aspects of the relationship

---

[15] Defendants suggest application of a possible seventh 'public interest' exception.  *Def.'s Opp'n* at 15-16.  The Supreme Court recently rejected a seventh "virtual representation" exception.  *Taylor*, 128 S. Ct. at 2178 (stating that "we disapprove the theory of virtual representation on which the decision below rested").  Instead *Taylor* directed the federal court to determine issues of claim preclusion "according to the established grounds for nonparty preclusion described in this opinion."  *Id.*  Even though as the First Circuit recently wrote, the claim preclusion doctrine remains "a work in progress," the Court will hew to clear and recent Supreme Court guidance and apply only those exceptions *Taylor* approved.  *Negron-Fuentes v. UPS Supply Chain Solutions*, 532 F.3d 1, 10 (1st Cir. 2008).

among API, AWI, and WAM, the substance of which do not appear to be contested by Plaintiffs. *Def.'s Opp'n* at 13-14; *Pl.'s Reply* at 10-15.

First, API, AWI, and WAM are each dedicated to animal protection. *Def.'s Opp'n* at 13.

Second, the organizations have members in common. *Id.* For example, Defendants allege that Daryl DeJoy, Dena Winslow, and William Randall are (or were) members of both WAM and API, and each submitted declarations in the API case. *Id.*

Third, as earlier described, Camilla Fox and Daryl DeJoy have been involved in both suits. *Id.* at 13-14.

Fourth, AWI and API have been co-plaintiffs in a number of cases. *Id.*

The Court first addresses the second, fourth, and fifth *Taylor* exceptions, concluding that they are unlikely to apply here. The third exception, adequate representation by party to a prior suit, is a closer call and is addressed last.

### i.    Pre-existing Substantive Legal Relationship

Under the second *Taylor* exception, "nonparty preclusion may be justified based on a variety of pre-existing substantive legal relationships between the person to be bound and a party to the judgment." *Taylor*, 128 S. Ct. at 2172 (internal quotation and alterations omitted). Founded upon principles of property law, qualifying relationships under this exception "include, but are not limited to, preceding and succeeding owners of property, bailee and bailor, and assignee and assignor." *Id.* Here, Defendants contend that "AWI, API, and WAM appear to have some sort of relationship," but concede that "whether it is sufficient to satisfy the privity requirement is difficult to say." *Def.'s Opp'n* at 14. Without more, the Court cannot conclude that the type of pre-existing substantive legal relationship envisioned under the second *Taylor* exception exists here.

### ii. Assumption of Control over Prior Litigation and Relitigation Through Proxy

In this case, the analysis of the fourth and fifth *Taylor* exceptions is the same. Under the fourth *Taylor* exception, "a nonparty is bound by a judgment if she assumed control over the litigation in which that judgment was rendered" on the basis that such party has "had [her] day in court." *Id.* at 2173 (internal quotation and alterations omitted). Defendants argue this exception may apply because "[t]he fact that only API filed the first lawsuit may have been some sort of litigation strategy agreed upon by API, AWI, and WAM." *Def.'s Opp'n* at 14. Acknowledging that "technically neither Ms. Fox nor Mr. DeJoy are the parties" to the present suit, Defendants contend "they appear to have controlled the litigation the last time around, and are doing so again." *Id.*

Under the fifth *Taylor* exception, "a party bound by a judgment may not avoid its preclusive force by relitigating through a proxy." *Taylor*, 128 S. Ct. at 2173. This exception applies where "a person who did not participate in a litigation later brings suit as the designated representative of a person who was a party to the prior adjudication" and is likely "appropriate when a nonparty later brings suit as an agent for a party who is bound by a judgment." *Id.* To this end, Defendants note that "API may be unhappy with the bargain it struck in the first case, and, realizing that it would be precluded from relitigating the matter, has convinced AWI and WAM to bring this case" *Def.'s Opp'n* at 14-15.

Each of these *Taylor* arguments is grounded on suspicions, but these suspicions have not hardened into evidence, and for purposes of the motion for preliminary injunction, have been effectively rebutted by the Fox and DeJoy declarations. The Court declines to apply either the fourth or fifth *Taylor* exceptions.

### iii.     Adequate Representation

The third *Taylor* exception is the most relevant.  By its terms, "in certain limited circumstances," a nonparty may be precluded from bringing suit where that nonparty was "adequately represented by someone with the same interests who was a party" to the prior suit. *Taylor*, 128 S. Ct. at 2172 (internal quotation and alterations omitted).  The *Taylor* Court identified "[r]epresentative suits" under this exception to "include properly conducted class actions . . . and suits brought by trustees, guardians, and other fiduciaries."  *Id.* at 2172-73.  The Court established a test:

> A party's representation of a nonparty is "adequate" for preclusion purposes only if, at a minimum: (1) the interests of the nonparty and her representative are aligned, and (2) either the party understood herself to be acting in a representative capacity or the original court took care to protect the interests of the nonparty.  In addition, adequate representation sometimes requires (3) notice of the original suit to the persons alleged to have been represented.

*Id.* at 2176 (internal citations omitted).

As with the fourth exception, Defendants offer limited argument, opining about the possibility of "some sort of litigation strategy" and alleging that Ms. Fox and Mr. DeJoy "appear to have controlled the [API] litigation the last time around, and are doing so again."  *Def.'s Opp'n* at 14.  For their part, Plaintiffs argue that because there "was no such litigation strategy, this exception does not apply."  *Pls.' Reply* at 11.  The issue is more nuanced.

As an initial matter, this situation does not fit the profile of the representative suits the *Taylor* Court identified as fitting this exception.  In its suit, API did not seek class certification, and API is not trustee, guardian, or fiduciary for AWI or WAM.  This conclusion, however, does not end the inquiry.

The first prong of the adequate representation test asks whether the interests of AWI and WAM are aligned with those of API.  API, AWI, and WAM are each dedicated to the protection

of wildlife. The Court is satisfied that the interests of API, AWI, and WAM are generally aligned.[16]

The second prong requires either that API understood itself to be acting in a representative capacity in the API suit *or* that this Court took care to protect AWI and WAM's interests in the API suit. The Court is aware of no evidence that suggests API purported to be acting on behalf of AWI or WAM. Nor is the fact that API sought to advance the same public interest now pursued by AWI and WAM, the protection of lynx, adequate grounds by itself to find that API acted in a representative capacity.[17] *See Richards v. Jefferson County*, 517 U.S. 793, 800-01 (1996); *see also Headwaters, Inc. v. U.S. Forest Serv.*, 399 F.3d 1047, 1054-57 (9th Cir. 2005).

Even if API did not act in a representative capacity, the second prong is satisfied if this Court took care to protect AWI and WAM's interests in the API suit. There is little guidance regarding what constitutes sufficient "care," nor has the Court found a case where a federal court exercised sufficient care to satisfy this prong. *See e.g.*, *Headwaters*, 399 F.3d at 1056 (overturning a finding of claim preclusion and noting that the district court in an earlier case "did not provide any safeguards to assure that all parties potentially affected by the judgment were adequately represented"). *Headwaters* suggests that if the district court "approved the stipulation of dismissal as fair to absent parties," this could satisfy the second prong. *Id.* In its consideration of the API litigation, however, the Court was not asked to and did not consider the effect of the Consent Decree on absent parties like AWI and WAM.

---

[16] The more precise descriptions of these three organizations reveal subtle differences in their missions. Whether, if further elaborated, the three organizations would be sufficiently identical in interests to meet *Taylor*'s first prong remains to be seen. However, the evidence is insufficient to draw any conclusions about these differences, if in fact they are pronounced.

[17] The Court is not precluding the possibility that discovery may yield evidence of cooperation and coordination between the organizations. At a minimum, at this point it seems clear that API, AWI, and WAM are not "mere strangers" to one another. *See Richards*, 517 U.S. at 802.

Adequate representation may also require a third prong:  notice of the original suit to the parties alleged to have been represented.  *Taylor*, 128 S. Ct. at 2176.  Without notice, "the right to be heard ensured by the guarantee of due process has little reality or worth."  *Richards*, 517 U.S. at 799 (internal quotation omitted).  However, "mere notice may not suffice to preserve one's right to be heard."  *Id.* n.5.  Given Ms. Fox and Mr. DeJoy's alleged involvement in the API suit, as well as their positions with the current Plaintiffs, it is inconceivable that they lacked notice of the API suit.

In sum, the Court cannot conclude at this early stage in the litigation that WAM and AWI were adequately represented by API in the prior suit.  As with other *Taylor* issues, discovery may lead to evidence that supports a more direct intertwining among these three organizations regarding the API suit, but the current evidence does not sustain such a finding.

### b.    *Taylor v. Sturgell* Conclusion

Based on the current record, the Court finds that none of the *Taylor* exceptions applies to this case.  The Court's finding is with a caveat.  When the same actors appear in different roles in different scenes, it is not illogical to conclude they are taking part in the same play.  For purposes of future action, if any, the Court's credulity has limits.

### 6.    Identity of Cause of Action in Both Lawsuits

To establish claim preclusion, the third necessary element is identity of the cause of action in both suits.  *Grella*, 42 F.3d at 30.  Defendants simply assert that this element is "clearly met."  *Def.'s Opp'n* at 11.  Plaintiffs dispute this conclusion, contending that this lawsuit involves takes during the 2007 trapping season; whereas, the API suit involved prior takes.  *Pls.' Reply* at 9-10.

In 2005 and again in 2006, the First Circuit suggested that the Plaintiffs may be correct. In *Gonzalez-Pina v. Rodriguez*, 407 F.3d 425, 430 (1st Cir. 2005), and *Charter Communc'ns. Entm't I v. Burdulis*, 460 F.3d 168, 179 n.12 (1st Cir. 2006), the First Circuit, discussing when res judicata would bar multiple claims, approvingly quoted *Kilgoar v. Colbert County Bd. of Educ.*, 578 F.2d 1033 (5th Cir. 1978), which addressed what constitutes the same cause of action. In *Kilgoar*, the Fifth Circuit observed that "plaintiffs are not barred from presenting any ground for relief arising out of conduct not complained of in the prior lawsuits.  Subsequent conduct, even if it is of the same nature as the conduct complained of in a prior lawsuit, may give rise to an entirely separate cause of action."  *Id.* at 1035.

Here, the Plaintiffs are claiming that events after the Consent Decree have in effect eclipsed the underpinnings of the Decree.  Here, the parties agree that immediately following the issuance of the Consent Decree, eight lynx were found trapped in the types of traps approved by the Decree.  The Court cannot conclude in view of these subsequent events, even though of the same general nature of the conduct complained of in the prior lawsuit, that the Plaintiffs' claims are so similar to the prior claims that they are precluded.

### E.    The Plaintiffs' Delay:  Laches

Defendants contend that Plaintiffs have unjustifiably delayed in bringing both this lawsuit and the pending motion for preliminary injunction, and argue that Plaintiffs' procrastination is sufficient grounds for outright denial of Plaintiffs' motion under the doctrine of laches, or, at a minimum, is a relevant consideration in the Court's evaluation of possible irreparable harm if injunctive relief is denied.  *Def.'s Opp'n* at 9-11.

This Court recently discussed the doctrine of laches in the context of an election law dispute:

> Laches is "an equitable doctrine which penalizes a litigant for negligent or
> willful failure to assert his rights." *Valmor Products Co. v. Standard Products
> Corp.*, 464 F.2d 200, 204 (1st Cir. 1972). Equity "ministers to the vigilant,
> not to those who sleep upon their rights." *Texaco Puerto Rico, Inc. v. Dep't of
> Consumer Affairs*, 60 F.3d 867, 879 (1st Cir. 1995). However, to bar the
> assertion of a claim, laches requires that the party's delay in bringing the
> lawsuit was "'1) unreasonable, and 2) resulted in prejudice to the opposing
> party.'" *Sch. Union No. 37 v. Ms. C.*, 518 F.3d 31 (1st Cir. 2008) (quoting *K-
> Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989)).
> Further, laches is an affirmative defense and a defendant claiming laches has
> the burden "of proving both unreasonableness of the delay and the occurrence
> of prejudice." *K-Mart*, 875 F.2d at 911. The proponent of the doctrine "must
> make a clear showing of prejudice." *Sch. Union No. 37*, 518 F.3d at 35.

*Dobson v. Dunlap*, No. CV-08-292-B-W, 2008 WL 4273200, at *4 (D. Me. Sept. 16, 2008).

Courts consider the public interest in determining whether to deny a claim or motion under laches. *See, e.g.*, *Envtl. Def. Fund v. Tenn. Valley Auth.*, 468 F.2d 1164, 1182-83 (6th Cir. 1972). In general, the doctrine is disfavored in environmental cases, where the purported injury is commonly not limited to the party bringing suit. *Park County Res. Council, Inc. v. U.S. Dep't of Agric.*, 817 F.2d 609, 617 (10th Cir. 1987) ("[L]aches must be invoked sparingly in environmental cases because ordinarily the plaintiff will not be the only victim of alleged environmental damage."); *see also Pres. Coal., Inc. v. Pierce*, 667 F.2d 851, 854 (9th Cir. 1982); *Cady v. Morton*, 527 F.2d 786, 793 (9th Cir. 1975); *Me. People's Alliance v. Holtrachem Mfg. Co.*, Civil No. 00-69-B-C, 2001 U.S. Dist. LEXIS 21035, at *6 (D. Me. Dec. 14, 2001); *Bays' Legal Fund v. Browner*, 828 F. Supp. 102, 107 n.11 (D. Mass. 1993).

The parties disagree on when Plaintiffs became aware of the eight lynx trappings in November 2007. Defendants contend that Plaintiffs knew that very month; Plaintiffs claim they learned in January 2008. *Def.'s Opp'n* at 9; *Pls.' Reply* at 6 n.5. In any event, Plaintiffs concede that they took no action until late May 2008, arguing that they were awaiting the outcome in *Holsten* and were giving the DIFW "the benefit of the doubt that it would file a complete ITP

application." *Pls.' Reply* at 8.   On May 28, 2008, Plaintiffs sent the DIFW the statutorily mandated sixty-day notice of intent to sue letter pursuant to 16 U.S.C. § 1540(g).   *Def.'s Opp'n* Attach. 7, *Letter from Judith M. Brawer to Roland M. Martin*.   On August 11, 2008, Plaintiffs filed suit, *Compl.*, and on September 23, 2008, Plaintiffs moved for a preliminary injunction. *Pls.' Mot.*   The trapping season began on October 19, 2008.   *Def.'s Opp'n* at 9.

The burden is on the Defendants to show that Plaintiffs' delay was unreasonable and resulted in prejudice.   *K-Mart*, 875 F.2d at 911.   Whether the Plaintiffs learned about the eight lynx in November 2007 or January 2008 is not relevant.   The Plaintiffs' decision about whether to file a notice of claim did not depend upon when they learned of the eight lynx, but when Judge Davis decided *Holsten*.   Once Judge Davis issued his decision on March 31, 2008, the Plaintiffs filed the sixty-day notice on May 28, 2008, less than two months later.   The Court does not view the Plaintiffs' strategic decision to await the outcome of *Holsten* as unreasonable.   If another federal district court, acting on a case with remarkably similar facts, had decided critical matters adversely to the Plaintiffs' anticipated positions in this case, it should have given the Plaintiffs pause as to whether to file suit here at all.   To await *Holsten* seems prudent, not unreasonable.

Plaintiffs' delay in seeking a preliminary injunction is a different matter.   Plaintiffs offer no explanation for why they waited until September 23, 2008, six weeks after filing suit and less than a month from the start of the trapping season, to seek a preliminary injunction.   Nor is there doubt that Plaintiffs were fully aware of the fast-approaching trapping season.   The Court finds Plaintiffs' delay in seeking a preliminary injunction curious.

Defendants devote limited energy to explicating the prejudice caused by Plaintiffs' delay in seeking a preliminary injunction.   The DIFW acknowledges the prejudice in this case is not as compelling as that shown in *Dobson*, where the Secretary of State of Maine had invested

considerable time and money preparing for the upcoming election and grant of preliminary injunctive relief would have threatened the disenfranchisement of voters. *Def.'s Opp'n* at 9-10. The DIFW asserts two sources of alleged prejudice: (1) the DIFW's lack of opportunity to explore the relationship between Plaintiffs in this suit and API; and, (2) the DIFW's lack of opportunity to explore the qualifications of Plaintiffs' experts. *Id.* at 10. Intervenors do not supplement this list, instead simply joining the DIFW's presentation. *Trappers' Opp'n* at 2. The Court observes that the Defendants do not claim that the delay in filing the motion for preliminary injunction itself prejudices them. The Plaintiffs did not wait until just before the opening of trapping season and spring a motion for a temporary restraining order on the Defendants and, if there had been prejudice from the late filing of the motion for preliminary injunction, the Defendants could have brought the need for more time to respond to the Court's attention. They did not.

Defendants' specific claims of prejudice are unavailing. The Court already determined that claim preclusion does not apply, because API could have initiated this lawsuit. The first ground—discovery on the relationship among API and the Plaintiffs—is therefore unconvincing. Regarding the second ground—discovery about the background of the Plaintiffs' experts—the Court notes that Camilla Fox, the Plaintiffs' primary expert, is not unknown to the Defendants. In the API lawsuit, they not only deposed her, but also filed a motion to strike her testimony, based on an asserted lack of expert qualifications. *API, Def.'s Mot. to Strike Pl.'s Purported Expert Witness* (Docket # 75). In addition to Ms. Fox, the Plaintiffs submitted the declarations of two expert witnesses, Marc Bekoff, Ph.D., and Paul Paquet, Ph.D. *Pls.' Mot.* Attach. 30, *Decl. of Dr. Marc Bekoff*; Attach. 32, *Decl. of Dr. Paul Paquet.* Assuming the experts' declarations presented questions of expert qualifications, the Defendants would have been fully

38

capable of raising that issue by motion seeking permission to engage in limited discovery.  They did not do so.  Further, unlike Ms. Fox in 2006, neither Dr. Bekoff, who holds a doctorate and is an emeritus professor of ecology and evolutionary biology at the University of Colorado, Boulder, nor Dr. Paquet, who also holds a doctorate and is an adjunct professor in the Department of Veterinary Pathology at the Western College of Veterinary Medicine at the University of Saskatchewan, raise facial concerns of expertise.

The Court remains unconvinced that the Defendants suffered any prejudice from the late filing of the motion for preliminary injunction and, by contrast, there is a substantial countervailing public interest in protecting threatened species.  *See TVA*, 437 U.S. at 174 ("the highest of priorities").  The Court rejects the Defendants' claims that the Plaintiffs' cause of action and motion for preliminary injunction are barred by the doctrine of laches.

**F.      The Commissioner's Request for a Stay**

In 1982, Congress amended the ESA to allow non-federal actors to apply for a permit to engage in the otherwise prohibited taking of protected species under limited circumstances. Endangered Species Act Amendments of 1982, Pub. L. No. 97-304, sec. 6, § 10, 96 Stat. 1411, 1422-24 (1982).  To obtain an ITP, however, the applicant must submit a comprehensive habitat conservation plan and the USFWS, after allowing for public comment, must find that the take complies with specific statutory criteria.  *See* 16 U.S.C. § 1539(a)(2)(A)-(B).

The state of Maine applied for an ITP on June 29, 2007.  *Elowe Aff.* ¶ 71.  In October 2007, the USFWS staff expressed concern about whether the application met its criteria.  *Id.* ¶ 72.  The Commissioner agreed to revise and resubmit the application.  *Id.*  In May, 2008, a "semi-final draft" was sent to USFWS, *id.* ¶ 75, and after additional consultation with USFWS,

the DIFW submitted a final ITP application to USFWS.[18]  *Id.* ¶ 76.  The DIFW application is being reviewed by the USFWS headquarters staff for Region 5, and once its review is complete, the DIFW application will be sent to USFWS in Washington, D.C. for acceptance and publication in the Federal Register.  *Id.* ¶ 79.  However, before the application may be published in the Federal Register, the USFWS must prepare a document pursuant to the National Environmental Policy Act (NEPA).  *Id.* ¶ 80.  Upon publication, the USFWS will accept public comment for between thirty and sixty days, will consider those comments, and will grant or deny the application.  *Id.* ¶¶ 81-82.  The DIFW estimates that the USFWS will make a decision on its application between six and twelve months after the comment period is closed.  *Id.* ¶ 82.  If USFWS grants the DIFW an ITP allowing some incidental takes of lynx by licensed trappers, the present action may be rendered moot.  *Def.'s Opp'n* at 7-8.  In the name of judicial economy then, the DIFW urges the Court to stay this action pending resolution of its ITP application.  *Id.*

The DIFW also contends that any prejudice suffered by issuance of a stay is "undercut by plaintiffs' unreasonable delay" in seeking preliminary injunctive relief.  *Id.* at 8.  But, this argument is a non-starter.  In measuring consequences of the Plaintiffs' dilatoriness, the Court is concerned with potential prejudice to lynx, not just its proponents.  *See Park County Res. Council, Inc.*, 817 F.2d at 617 (noting that in environmental cases "ordinarily the plaintiff will not be the only victim of alleged environmental damage").

> The Court's authority to issue Defendants' requested stay is not disputed.
>
> [T]he power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants.  How this can best be done calls for the exercise of judgment, which must weigh competing interests and maintain an even balance.

---

[18] Although the DIFW submission is final, it is still considered a "draft" by the USFWS until the federal agency officially adopts it.  *Elowe Aff.* ¶ 76.

*Landis v. N. Am. Co.*, 299 U.S. 248, 254-55 (1936); *Microfinancial, Inc. v. Premier Holidays Int'l, Inc.*, 385 F.3d 72, 77 (1st Cir. 2004) ("It is apodictic that federal courts possess the inherent power to stay proceedings for prudential reasons.").  Nor is there argument that the mere filing of a draft ITP application divests the Court of jurisdiction, or removes the Court's discretion to decide whether to grant a stay.  *See Loggerhead Turtle v. County Council of Volusia County*, 896 F. Supp. 1170, 1177 (M.D. Fla. 1995), *rev'd on other grounds*, 148 F.3d 1231 (11th Cir. 1998) (finding that the filing of an ITP application does not divest the court of jurisdiction); *see also Holsten*, 541 F. Supp. 2d at 1076.  In fact, in *Loggerhead Turtle*, addressing a similar situation, Judge Roney in dissent suggested, since there was a dispute about whether an ITP in that case authorized takings caused by artificial lights, the appeals court "could simply require a stay of the district court proceedings while the defendant repairs to the [USFWS] to get a clarification on that point."  *Loggerhead Turtle*, 148 F.3d at 1260.

The resolution of this issue depends largely on the extent to which the lynx are subject to impermissible takes under the restrictions in the Consent Decree.  If the lynx are not subject to impermissible takes, staying the case until the USFWS acts on the pending application will do no harm.  If the lynx are subject to impermissible takes, to stay the case would sanction an ongoing violation of the ESA.  In the latter case, the Court is chary to delay granting relief, particularly in the ESA context, where Congress has directed that "endangered species . . . be afforded the highest of priorities."[19]  *TVA*, 437 U.S. at 174.  Thus, the resolution of this issue is generally congruent with the resolution of the merits of the motion for preliminary injunction.  If the USFWS approves the DIFW's ITP application, the gravamen of the Plaintiffs' claim would be

---

[19] The DIFW observes that issuance of a stay "would not excuse the State from continuing to comply with the various measures in the Consent Decree designed to protect the lynx."  *Def.'s Opp'n* at 8.  Plaintiffs' suit, however, is bottomed on the contention that the DIFW is violating the ESA *despite* its compliance with the Consent Decree.  If this contention is true, continued compliance does nothing to remedy the ongoing harm.

precluded and the case, if stayed, would be subject to dismissal.  If the USFWS does not approve the application, the Plaintiffs' lawsuit would be substantially reinvigorated, and in that event, it would be of no real moment whether the Plaintiffs would reinitiate their claim or move to remove the stay.  None of these considerations is sufficiently convincing for the Court to exercise its discretion and hold in abeyance a ruling on the merits of the motion for preliminary injunction.

### G.     The Merits of the Motion for Preliminary Injunction

#### 1.     The Likelihood of Success on the Merits

##### a.     Whether the Plaintiffs Demonstrated an Impermissible Take; the State's Role in Licensing; and, Proximate Causation

In evaluating a motion for preliminary injunction, the first consideration is whether the Plaintiffs are likely to succeed on the merits of their lawsuit.  *Esso Standard. Oil*, 445 F.3d at 18 (stating that the "*sine qua non* of this four-part inquiry is likelihood of success on the merits:  if the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity") (internal quotation and citation omitted).  Under § 9 of the ESA, any person is prohibited from "taking" an endangered species.  16 U.S.C. § 1538(a)(1)(B).  As of March 24, 2000, the Canada lynx was listed as a threatened species, 65 Fed. Reg. 16052 (March 24, 2000) (codified at 50 C.F.R. § 17.11(h)).  Under the statutory scheme, there are three categories of federally-protected species under the ESA:  endangered species, threatened species, and experimental populations.[20]  Endangered species are entitled to the highest level of protection.  *TVA*, 437 U.S. at 174 (stating that "examination of the language,

---

[20] Endangered species are "any species which is in danger of extinction throughout all or a significant portion of its range other than a species of Class Insecta determined by the Secretary to constitute a pest whose protection under the provisions of this Act would present an overwhelming and overriding risk to man."  16 U.S.C. § 1532(6).  Threatened species are defined as "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range."  16 U.S.C. § 1532(20).  Experimental populations are treated similarly to threatened species with some defined exceptions.  *See* 16 U.S.C. § 1539(j).

history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities"). Threatened species "are afforded fewer protections than endangered species." *Humane Soc'y of the U.S. v. Kempthorne*, 481 F. Supp. 2d 53, 65 (D.D.C. 2006). Nevertheless, the lynx's status as a threatened as opposed to endangered species does not take it outside the prohibitions against a take.[21]   50 C.F.R. § 17.31(a); *Loggerhead Turtle*, 148 F.3d at 1237; *United States v. Town of Plymouth*, 6 F. Supp. 2d 81, 90 (D. Mass. 1998).

The ESA defines "take": "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The First Circuit has noted that a "take" is "defined . . . in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *Strahan v. Coxe*, 127 F.3d 155, 162 (1st Cir. 1997). Trapping that causes harm is subsumed under "harm" and by adding the term "trap," Congress must have intended a meaning distinct from "harm." *United States v. Menasche*, 348 U.S. 528, 538-39 (1955) (stating that "[i]t is our duty to give effect, if possible, to every clause and word of a statute") (internal quotation and citation omitted); *United States v. Rodriguez*, 26 F.3d 4, 8 (1st Cir. 1994). It follows, even if a lynx is harmlessly trapped, it has been subject to a prohibited take under the statute. Consequently, even assuming that no lynx has been harmed since issuance of the Consent Decree, that at least eleven lynx have been trapped since its adoption is alone sufficient

---

[21] The ESA expressly prohibits taking an endangered species. 16 U.S.C. § 1538(a)(1)(B). It does not expressly prohibit taking a threatened species; however, the ESA allows the USFWS to promulgate rules that "provide for the conservation" of threatened species. 16 U.S.C. § 1533(d). USFWS has issued a blanket regulation that applies all prohibitions applicable to endangered species to threatened species, unless the agency has issued a special rule, a § 4(d) Rule, for a specific species. 50 C.F.R. § 17.31. Whether the distinction between endangered and threatened species allows for distinctions in regulation is the source of some controversy. *See Sierra Club v. Clark*, 755 F.2d 608, 612-19 (8th Cir. 1985); *Kempthorne*, 481 F. Supp. 2d at 64-65. But, the Defendants have not raised the Canada lynx's status as a threatened, as opposed to endangered, species as a basis for justifying a more relaxed view of the general prohibition against takes.

to constitute "take" as that term is expansively defined in the ESA.  Because the statute explicitly prohibits such take in the absence of an ITP, the Court concludes that the Plaintiffs have made out a case of violation of the ESA that has a reasonable likelihood of success on the merits.

The DIFW, however, argues that "there is nothing in the ESA that imposes any legal obligation on states to take affirmative actions to protect listed species.  Further there is no provision in the ESA suggesting that when states license an activity, they have a legal obligation to ensure that the activity poses no risk to listed species."  *Def.'s Opp'n* at 17.  The DIFW continues, "even if states might sometimes be liable for licensing private activities that cause takes of listed species, plaintiffs still must establish proximate causation."  *Id.*  Simply by licensing an activity, the state is not, according to the DIFW, responsible for the harm caused by the licensee.  *Id.* at 18.

That the ESA does not impose affirmative obligations on the states to prevent takes by private persons is correct, but not germane.  The state of Maine has the unquestioned authority to "conserve, protect and regulate its wildlife."  *State v. McKinnon*, 153 Me. 15, 18, 133 A.2d 885, 887 (1957).  This is true, even though the ancient concept of state ownership of wildlife is now "generally regarded as but a fiction."  *Hughes v. Oklahoma*, 441 U.S. 322, 334 (1979) (citation omitted).  The state's authority to regulate the hunting and trapping of game rests not on its ownership of the wildlife, but on its "power to preserve and regulate the exploitation of an important resource."  *Id.* at 335.  In Maine, unless the state authorizes it, no one has the authority to hunt or trap an animal.  12 M.R.S.A. §§ 10951, 12251(1).  The question, then, is not whether the state has an obligation to undertake an affirmative act, but whether, when it undertakes an affirmative act by authorizing trapping, it is violating the ESA.

This question is settled in the First Circuit.  In *Coxe*, the First Circuit addressed an ESA challenge to a Massachusetts licensure scheme under which endangered Northern Right whales were becoming entangled in state-permitted fishing gear.  127 F.3d at 158.  The First Circuit readily concluded that "a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA." *Id.* at 163.

The DIFW points to statutory language to support the proposition that the state's regulation of trapping has not "caused" incidental takes of lynx.  *Def.'s Opp'n* at 17.  The ESA prohibits "any person . . . to attempt to commit, solicit another to commit, or cause to be committed, any offense defined in this section."  16 U.S.C. § 1538(g).  Thus, it argues, this language imbues the ESA's prohibitions with the tort concept of proximate cause and, measured against basic principles of proximate causation, a state does not cause an incidental take by allowing a trapping season for other animals.  *Def.'s Opp'n* at 17-18.

On this point, the distinction between motorists and commercial fishing operations the First Circuit discussed in *Coxe* is useful.  *Coxe* highlighted the distinction:

> [T]he state has licensed commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to result in a violation of federal law. The causation here, while indirect, is not so removed that it extends outside the realm of causation as it is understood in the common law.

*Coxe*, 127 F.3d at 164.  Similarly, the state of Maine, through the DIFW, has issued trapping licenses that allow traps likely to result in a violation of federal law in the form of prohibited takings.  Further, in terms of causation, the distinction between motorists and trappers seems obvious:  the trapper is seeking to trap animals; the motorist is not.  The causation requirement would, therefore, apply with special force to the exercise of a ubiquitous legal activity, such as driving, which has a statistically minuscule likelihood of taking a lynx.  By contrast, by

authorizing trapping, Maine creates the likelihood that lynx—along with the preferred animal—will find its way into a trap.  In sum, the First Circuit in *Coxe* decisively concluded that a state may be exposed to liability under the ESA for takes resulting from state regulation and, as an inferior court, the Court must abide that decision.  *Gately v. Massachusetts*, 2 F.3d 1221, 1226 (1st Cir. 1993).

### b.    The Tenth Amendment

The state of Maine has another arrow in its quiver.  It claims the Tenth Amendment of the United States Constitution prohibits Congress from regulating its conduct and by extension prohibits this Court from enforcing a federal statute against the state that violates the Tenth Amendment.  *Def.'s Opp'n* at 24-25.

The Tenth Amendment provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."  U.S. CONST. amend. X.  The Amendment generally prohibits Congress from "regulat[ing] the conduct of the states."  *Coxe*, 127 F.3d at 167.  "Nevertheless, a valid act of Congress, enacted pursuant to its Commerce Clause powers, seeking to regulate a particular area, is the 'supreme law of the land,' . . . and preempts state laws or regulations that conflict with the act."  *Id.* (quoting U.S. CONST. art. VI, cl. 2).  "[T]he commands of the Tenth Amendment apply to all branches of the federal government, including the federal courts."  *Id.* at 169.

In *Coxe*, the First Circuit denied a Tenth Amendment challenge to a preliminary injunction to reduce the likelihood that Northern Right whales, an endangered species, would be caught by fishing gear.  *Coxe*, 127 F.3d at 167-70.  Massachusetts officials argued unsuccessfully that the district court's ruling violated the Tenth Amendment because it commandeered state governments into service of federal regulatory purposes.  *Id.* at 167.  The district court had

ordered Massachusetts to (1) apply for an ITP; (2) apply for a permit under another federal act; (3) develop a proposal to "restrict, modify or eliminate" the use of certain gear "to minimize the likelihood additional whales will actually be harmed by such gear"; and (4) convene a working group with plaintiff as well as other interested parties regarding possible measures.  *Id.* at 158.

*Coxe* observed that the ESA's prohibition on takings extends not only to private citizens, but to "'any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government.'"  *Id.* at 167-68 (quoting 16 U.S.C. § 1532).  "By including the states in the group of actors subject to the Act's prohibitions, Congress implicitly intended to preempt any action of a state inconsistent with and in violation of the ESA."  *Id.* at 168.  If the state's regulation "likely results in a taking in violation of the far-reaching provisions of the ESA," the state's scheme "cannot continue insofar as its operation is inconsistent with the intent of the ESA."  *Id.*

In this case, the issue raised by the DIFW is not whether Congress acted within its authority in enacting the ESA (it did), nor whether existing lynx regulations that conflict with the ESA must fall under the Supremacy Clause (they must).  *See id.* at 168.  The question is what remedies are available to the Court.  *Coxe* provides an explicit answer:  "[t]he ESA does not limit the injunctive power available in a citizen suit," but instead "grant[s] a district court the full scope of its traditional equitable injunctive powers."  *Id.* at 170.

Here, Plaintiffs' Complaint seeks "[a]n order enjoining the Defendant from continuing to violate the ESA by authorizing, administering or allowing trapping practices that 'take' Canada lynx."  *First Am. Compl.* at Prayer for Relief.  Such a remedy, expressly authorized by the ESA itself, 16 U.S.C. § 1540(g)(1)(A), is well within the Court's traditional equitable injunctive powers, and acting alone does not injure Plaintiffs' likelihood of success on the merits.

In *Coxe*, the First Circuit clarified that the district court had not ordered Massachusetts to ban gillnets and lobster pots; instead, "the injunction ordered the Commonwealth to consider means by which gillnets and lobster pots may be modified in order for the Commonwealth to avoid authorizing takings in its coastal waters in violation of federal law." *Coxe*, 127 F.3d at 168. Under this reasoning, the Plaintiffs' demands in their motion for preliminary injunction that the Court "[p]rohibit the use of leghold traps used on land (both ground and elevated sets) in the identified lynx WMDs (1-6 and 8-11) as well as in the two WMDs where lynx were trapped in 2007 (7 and 18)" and "[p]rohibit the use of killer-type traps with an opening of more than four inches in both ground and elevated sets" skirts Tenth Amendment prohibitions. *See Pls.' Mot.* at 27. As *Coxe* teaches, it is one thing for the Court to order the state of Maine not to continue to violate the ESA, but another thing for the Court to usurp the DIFW's regulatory authority to manage trapping under its regulatory scheme. *See Coxe*, 127 F.3d at 168. Whether a court order that adopts wholesale the Plaintiffs' desired remedies would cross the constitutional line drawn in *Coxe* need not be resolved. It is enough that, even if the Plaintiffs do not have a likelihood of success on all the demanded remedies, they have a likelihood of success on their fundamental demand: the cessation of unlawful takes of lynx in violation of the ESA.

### 2.    Irreparable Harm

The second criterion is whether the movant has demonstrated irreparable harm if the injunction is not granted. The parties spar on the meaning of irreparable harm in the ESA context. The Plaintiffs claim that "proof of definitive harm is not required, but only a demonstration of *significant risk* of irreparable harm." *Pls.' Reply* at 16 (emphasis in original). They also assert that "special rules" apply to ESA cases and once the Plaintiffs have met "all the other prongs," they do not need to make a definitive showing of irreparable harm. *Id.* They

48

argue that "the risk of harm to only a few, or even one lynx constitutes irreparable harm for the purposes of a preliminary injunction." *Id.* at 17.  The Commissioner raises a separate legal issue; he claims that a finding of irreparable harm requires "a showing that the species as a whole will be harmed." *Def.'s Opp'n* at 18.

### a.        Significant Risk of Irreparable Harm and *Winter*

To support their first point—that a movant need not demonstrate definitive harm, but only a significant risk of irreparable harm—the Plaintiffs correctly cite *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003) (stating that an "irreparable harm requirement is met if a plaintiff demonstrates a *significant risk* that he or she will experience harm that cannot be compensated after the fact by monetary damages" (internal quotation omitted) (emphasis in original)).  In arriving at this conclusion, *Greater Yellowstone* itself cited *Lanier Professional Services., Inc. v. Ricci*, which uses the language "a significant risk of irreparable harm." 192 F.3d 1, 3 (1st Cir. 1999).

On November 12, 2008, in *Winter v. National Resources Defense Council*, the United States Supreme Court clarified that to meet the irreparable injury requirement a movant must "demonstrate that irreparable injury is *likely* in the absence of an injunction."[22]  2008 U.S. LEXIS 8343, at *27 (emphasis in original).  *Winter* rejected the Ninth Circuit's "possibility" standard as "too lenient."  *Id.*  It is true that the *Winter* Court discussed the irreparable injury standard in the context of the Marine Mammal Protection Act of 1972, not the ESA.[23] Nevertheless, *Winter* suggests that the likelihood standard for irreparable injury is broadly applicable.  *Id.* (stating that "[o]ur frequently reiterated standard requires plaintiffs seeking

---

[22] The United States Supreme Court handed down *Winter* two days after oral argument in this case and the parties have not had an opportunity to address its implications.
[23] The Plaintiffs in *Winter* proceeded on a number of bases, including the ESA, but the Supreme Court reached only the claim under the Marine Mammal Protection Act.  *See Winter*, 2008 U.S. LEXIS 8343, at *18.

preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction").

Further, even before *Winter*, the First Circuit did not carry forward *Lanier*'s precise wording. The irreparable injury test as later articulated by the First Circuit was "the potential for irreparable harm if the injunction is denied." *Bl(a)ck Tea Soc'y*, 378 F.3d at 11 (quoting *Charlesbank Equity Fund II, Ltd. P'ship  v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004)). Consistent with *Winter*, the Court concludes that the correct test for irreparable injury is whether the Plaintiffs have demonstrated irreparable injury is likely if the injunction is not granted.

### b.    Special Rules for ESA Cases

The Plaintiffs next claim that the standard for injunctive relief under the ESA differs from the traditional analysis, and that "because plaintiffs have met all of the other prongs for issuance of a preliminary injunction, they do not need such a definitive showing of irreparable harm." *Pls.' Reply* at 16. The Court agrees, but only to a point. *Animal Prot. Inst. v. Martin*, 151 F. Supp. 2d 196, 197 (D. Me. 2007) (concluding that the balance of hardships and the public interest "tips heavily in favor of the protected species").

The Court does not agree, particularly following *Winter*, that if they demonstrate the other prongs for injunctive relief, the Plaintiffs are relieved from demonstrating irreparable injury. In fact, the case the Plaintiffs cite for support, says precisely the opposite. In *National Wildlife Federation v. Burlington Northern Railroad*, the Ninth Circuit wrote that the cases "do not stand for the proposition that courts no longer must look at the likelihood of future harm before deciding whether to grant an injunction under the ESA. Federal courts are not obligated to grant an injunction for every violation of the law. The plaintiff must make a showing that a

violation of the ESA is at least likely in the future." 23 F.3d 1508, 1511 (9th Cir. 1994) (citation omitted).

### c.      Harm to Species and to Individual Animals

The parties take diametric positions as to the degree of harm necessary to sustain the burden of irreparable injury. The Plaintiffs say that the "risk of harm to only a few, or even one lynx constitutes irreparable harm for the purposes of a preliminary injunction." *Pls.' Reply* at 17. The Commissioner contends that "[i]n the ESA context, a finding of irreparable harm requires a showing that the species as a whole will be harmed." *Def.'s Opp'n* at 18. This argument is significant because—especially if the focus is on the period after the Consent Decree—the evidence does not establish that the catching of ten lynx in leghold traps and the death of one in a Conibear trap without more represents a significant threat to the species as a whole. The Plaintiffs cite *Holsten*, 541 F. Supp. 2d at 1081; *National Wildlife Federation*, 23 F.3d at 1512; *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781, 787-88 (9th Cir. 1995); and, *Greater Yellowstone Coalition*, 321 F.3d at 1258-62. *Pl.'s Reply* at 17. The Commissioner cites *Water Keeper Alliance v. United States Department of Defense*, 271 F.3d 21, 34 (1st Cir. 2001), and, *State of Alabama v. United States Army Corps of Engineers*, 441 F. Supp. 2d 1123, 1135 (N.D. Ala. 2006). *Def.'s Opp'n* at 18-19. It also draws support from *Fund for Animals v. Frizzell*, 530 F.2d 982, 987 (D.C. Cir. 1975), a National Environmental Policy Act (NEPA) case.

In *Holsten*, Judge Davis concluded that injunctive relief was warranted despite the absence of any reported incidental takings of lynx since the winter of 2005. *Holsten*, 541 F. Supp. 2d at 1081. He was not "persuaded that the risk of incidental takings of lynx ha[d] disappeared" and he found it was "likely that additional takings may occur unless further regulations are implemented." *Id.* *Holsten*, though illuminating in other respects, cannot be

stating the correct standard for measuring irreparable injury.   In the context of trapping, to demonstrate the risk of incidental takings of an endangered or threatened species has disappeared would require the virtual elimination of trapping itself, something the law has not mandated nor for that matter does *Holsten* require.[24]

*National Wildlife*, though cited by Plaintiffs, is more equivocal.   The Ninth Circuit confirms that a "threat of extinction" is not "required before an injunction may issue under the ESA."   23 F.3d at 1512 n.8.   At the same time, *National Wildlife* required "a definitive threat of future harm to protected species, not mere speculation."   *Id.*   It cited *Fund for Animals, Inc. v. Turner*, where the district court granted a preliminary injunction after defendants conceded that without the injunction between three and nine grizzly bears would be killed in a sport hunt authorized under a federal regulation.   C.A. No. 91-2201 (MB), 1991 U.S. Dist. LEXIS 13426, at *25 (D.D.C. Sept. 27, 1991).   Before the November 17, 2008 death of the lynx in the Conibear trap, it was questionable whether the Plaintiffs had met the *National Wildlife* "harm" requirement, either to the ten lynx that were trapped and released or to the species as a whole. However, with the recent death, the Plaintiffs have demonstrated "harm" to at least one lynx from the Conibear trap.   It is a greater leap to extrapolate risk to the lynx as a species from the death of one, but the risk of the current Conibear restrictions to some lynx is unarguable and, as will be discussed, another factor in the equation is the minimal relative imposition from requiring immediate state action.

---

[24] That *Holsten* does not stand for the proposition that the risk of incidental take must be eliminated is evident from the remedy the court ordered, which in several respects appears *less* restrictive than existing trapping regulations in Maine under the Consent Decree.   For example, whereas *Holsten* merely restricted the size of permissible snares, *Minn. Proposal* at 5; *Minn. Order* at 4, Maine law prohibits their use entirely with a few narrow exceptions. 12 M.R.S.A. § 12252(2)(A); *Elowe Aff.* ¶ 21.   Further, unlike the Consent Decree, which restricted the size of leghold traps, *Consent Decree* ¶ 5(a), the *Holsten* court's remedy order placed no outright size restrictions on leghold traps. *Minn. Proposal* at 5; *Minn. Order* at 4.

Similarly, *Forest Conservation* is generally supportive.  In *Forest Conservation*, the Ninth Circuit confirms that the ESA authorizes injunctions against a future injury to a protected species.  50 F.3d at 787; *Am. Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir. 1993) (concluding that injunctive relief may be granted if the alleged activity "will actually, as opposed to potentially, cause harm to the species").  But, the Ninth Circuit remanded the case because it was disputed whether "the harvest is reasonably certain to impair the Swartz Creek owl pair's essential behavioral patterns."  *Forest Conservation Council*, 50 F.3d at 788.  If the standard of "harm" requires an assessment of the impact on the "essential behavior" of individual members of the species, the death of the lynx on November 17, 2008 undoubtedly affected its "essential behavior," but broadening the test to the "essential behavior" of the lynx species, the Court is unable at this time to identify significant impairment in the record before it.

*Greater Yellowstone* most directly supports the Plaintiffs' basic contention that it is not necessary to demonstrate harm to the species, but the case is of limited precedential value because it is not an ESA claim.  Faced with the loss of three bald eagle nests and twelve juvenile bald eagles due to construction, the Tenth Circuit agreed that "a proponent of a preliminary injunction . . . seeking to prevent harm to members of a threatened or endangered species, need not show harm to the species as a whole."  321 F.3d at 1257.  But, *Greater Yellowstone* was a Clean Water Act and NEPA claim.  In fact, *Greater Yellowstone* emphasized exactly that point: "[T]here is no reason why the ESA's language should govern the issue of irreparable harm. Plaintiffs have not brought an ESA challenge, and it would be preferable to base the determination of irreparable harm on the statutes that actually form the basis of the plaintiffs' claims."  *Id.  Greater Yellowstone* is of limited assistance.

*Loggerhead Turtle* supports the Plaintiffs' view.  In that case, Judge Conway rejected a defense argument that the takings of loggerhead and green sea turtles do not threaten the species with extinction:

> [T]he Act does not distinguish between a taking of the whole species or only one member of the species.  *Any taking and every taking* - - even of a single individual of the protected species - - is prohibited by the Act.  Hence the future threat of a even [sic] single taking is sufficient to invoke the authority of the Act.

896 F. Supp. at 1180; *see Swan View Coal. Inc.. v. Turner*, 824 F. Supp. 923, 938 (D. Mont. 1992) (stating that "the regulation does not indicate that threatened extinction is necessary for a finding of harm").  However, these courts emphasized that the takings constituted harm within the meaning of the federal regulations.  50 C.F.R. § 17.3 (defining "harm" as "an act which actually kills or injures wildlife.  Such an act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering").  In *Loggerhead Turtle*, for example, artificial beach lighting and beach driving were killing turtle hatchlings.  *Loggerhead Turtle*, 896 F. Supp. at 1174-75.  With the death of the lynx in the Conibear trap, the Plaintiffs have met the *Loggerhead* standard as to current Conibear regulations.

Leghold traps are a different story.  The parties have not cited and the Court has not found a case that addresses a taking as benign as the leghold takings in this case, where the lynx have been temporarily trapped and released, and any ensuing harm is speculative.[25]  Thus, even though "any taking and every taking," even a temporary trapping, invokes the authority of the Act, it does not follow that any taking and every taking, even those that do not cause actual harm, constitutes irreparable injury within the criterion for the issuance of injunctive relief.

---

[25] The Plaintiffs attempted to demonstrate that lynx, once trapped in a leghold trap, are more susceptible to further injury and death.  Based on the evidence in this record, the Court is not convinced.

The Commissioner relies on *Water Keeper Alliance v. United States Department of Defense*, 271 F.3d 21 (1st Cir. 2001).[26]  *Water Keeper* addressed a motion for preliminary injunction under the ESA, but had the additional complication that the plaintiffs sought the cessation of military exercises on the island of Vieques off Puerto Rico, thus invoking the compelling public policies behind a strong national defense.  *Water Keeper*, 271 F.3d at 26-27; *see also Winter*, 2008 U.S. LEXIS 8343, at *29.  Nevertheless, in its analysis of irreparable injury, the First Circuit focused on the impact on endangered species, not on the Navy's justification.  The First Circuit first acknowledged that *TVA* held that the ESA restricts the equity power of the court as to findings of irreparable injury.  *Water Keeper*, 271 F.3d at 34.  Even so, the First Circuit wrote:

> [T]he court did not abuse its discretion when it determined that Water Keeper's assertions concerning irreparable harm stemming from the 'death of even a single member of an endangered species' were insufficient to justify granting injunctive relief.  In support of its position of irreparable harm, Water Keeper can only point to vague concerns as to long-term damage to the endangered species expressed by [USFWS] and [National Marine Fisheries Service].  In the absence of a more concrete showing of probable deaths during the interim period and of how these deaths may impact the species, the district court's conclusion that Water Keeper has failed to show potential for irreparable harm was not an abuse of discretion.

*Id.*[27]

Among the authorities, *Water Keeper* is the most persuasive.  First, it is a decision of the First Circuit to which this Court owes direct allegiance.  Second, *Water Keeper* places the concept of irreparable harm within the greater context of the purpose of the ESA.  The First Circuit emphasized that the ESA "directs federal agencies to insure that agency action is not

---

[26] The Defendants also rely on *Alabama*.  However, the district court in that case did not address whether the taking of a single individual of a threatened species invokes the protection of the ESA.  The court concluded the state of Florida had failed to establish "the necessary causal link between the actions of the Corps and the harm to the mussels."  *Alabama*, 441 F. Supp. 2d at 1134.

[27] Though *Winter* is not an ESA case, the First Circuit in *Water Keeper* presages the Supreme Court's analysis in *Winter*.

likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species." *Water Keeper*, 271 F.3d at 25 (citing 16 U.S.C. § 1536(a)) (internal quotations omitted). It also emphasized the regulatory concern about the effect an agency action will have on the species or critical habitat. *Id.* (citing 50 C.F.R. § 402.14(a)).

Applying this guidance to the question of irreparable harm in this case results in a mixed answer. First, regarding leghold traps, the Court finds that the Plaintiffs have failed to establish that under the current state of Maine restrictions the lynx have suffered or will suffer irreparable harm. Even though the Plaintiffs have demonstrated a take under the ESA, which occurred when each lynx was caught in a leghold trap, the Court does not accept the view that "any take and every take" of whatever definition meets the standard for irreparable harm. *Coxe*, 127 F.3d at 171 (rejecting the contention that injunctive relief is mandatory upon a finding of a violation of the ESA). The Plaintiffs have failed to demonstrate that accidental trapping of lynx within the current leghold trap restrictions harmed a single lynx within the regulatory definition of harm, or that continued trapping between now and the anticipated USFWS action on the pending ITP application will do so. The Court is not persuaded that the temporary detention of a lynx in a leghold trap without some indication of permanent injury meets the legal standard for irreparable injury necessary for the Court's exercise of the equitable power of injunctive relief.

The November 17, 2008 killing of the lynx in the Conibear trap, however, highlights the tension between the uncompromising "death of one member" view in *Loggerhead Turtle* and the broader "species as a whole" view in *Water Keeper*. But, the Court does not view these cases as establishing impenetrable boundaries. The issue, it would seem, is more nuanced. The Court accepts the principle that the death of a single animal could constitute a violation of the ESA that

would call for the full exercise of a court's injunctive authority, and at the same time, there may be circumstances where the death of one member is an isolated event that would not call for judicial action.  The degree to which there is irreparable injury is a factor to be balanced against the other injunction criteria.  *Winter*, admittedly in the context of the Marine Mammal Protection Act, is an example of a more subtle approach.  Acknowledging the "seriousness of [the environmental] interests," the Supreme Court concluded that the public interest trumped "harm to an unknown number of . . . marine mammals."  *Winter*, 2008 U.S. LEXIS 8343, at *33-34.  Here, where there are approximately five hundred lynx in the state of Maine, the Plaintiffs have not established that the death of one threatens the species as a whole, but they have established that the current regulations are inadequate and it is predictable that if the regulations are not amended, other lynx will suffer irreparable harm.

### 3.    Balance of Relevant Impositions and the Public Interest

The third and fourth factors are a balance of relevant impositions and the public interest.  The Commissioner concedes these factors "weigh in favor of plaintiffs."  *Def.'s Opp'n* at 23.  Balancing these factors, however, is a complicated task.  To begin, there is no dispute the ESA mandates that protected species, like the lynx, are "to be afforded the highest of priorities."  *TVA*, 437 U.S. at 174.  In *Coxe*, the First Circuit taught that the balance of hardships and the public interest "tips heavily in favor of the protected species."  *Coxe*, 127 F.3d at 160 (internal quotation omitted).  It is also true that the Plaintiffs have established that lynx in Maine, even after the Consent Decree, have been subject to impermissible takes.

### a.    The ITP Application

In evaluating the relevant impositions and the public interest, the Court may properly examine what relief the Plaintiffs propose and what impact an injunction would have both upon

the protected species and upon the public as a whole.  Here, the Plaintiffs first demand that the Commissioner prepare and file an application for an ITP with the USFWS with a completed habitat conservation plan.  *Pls.' Mem.* at 27.  Time, however, seems to have eclipsed that demand.  When the Plaintiffs filed suit on August 11, 2008, the DIFW had not yet filed a final draft application.  Three days later, however, on August 14, 2008, the DIFW filed a final draft application with the USFWS, including a habitat conservation plan.  *Elowe Aff.* ¶¶ 76-77.  The Commissioner has represented that the regional USFWS staff has "expressed the view that our ITP application meets their submission criteria and is sufficient to warrant consideration by USFWS regional staff."  *Id.* ¶ 78.  Since the statute mandates that a comprehensive habitat conservation plan be submitted before an application for an ITP may be approved, it is likely that the DIFW's application contains a habitat conservation plan as required by law.  16 U.S.C. § 1539(a)(2)(A) (stating that "[n]o permit may be issued by the Secretary . . . unless the applicant therefor submits to the Secretary a conservation plan"); 16 U.S.C. § 1539(a)(2)(B) (stating that the Secretary may issue a permit only if it makes findings "with respect to a permit application and the related conservation plan").  Although the Plaintiffs may assert that the habitat conservation plan is inadequate, the USFWS, as the agency charged with evaluating ITP applications, is fully capable of making that determination.

### b.      Further Claims for Relief

The second claim for injunctive relief has two parts:  (1) a total restriction on leghold traps within the current WMDs; and, (2) an expansion of the Consent Decree restrictions into WMDs 7 and 18.  *Pls.' Mem.* at 27 (demanding that the Court "[p]rohibit the use of leghold traps used on land (both ground and elevated sets) in the identified lynx WMDs (1-6 and 8-11) as well as in the two WMDs where lynx were trapped in 2007 (7 and 18)").  According to the Trappers'

experts, however, a total ban on leghold traps would increase the population of coyote, bobcat, and fisher, animals that compete with the lynx for snowshoe hare and, in the case of fisher and coyote, prey upon the lynx. The Trappers also predict adverse economic consequences to trappers themselves and to livestock farmers, who will find it more difficult to protect their animals from coyote, bobcat, and fisher. Finally, the requested expansion into WMDs 7 and 18 is based on the discovery of one lynx caught in a leghold trap in each zone. Dr. Elowe stated that lynx are "primarily confined to the northern third of the state in [WMDs] 1 through 6 and 8 through 11. *Elowe Aff.* ¶ 9. Dr. Elowe said that the DIFW is considering whether to include WMD 7 in the lynx primary range, but that he believed that the lynx present in WMD 18 was a dispersing animal, in effect not indicative of a larger population in that zone. *Id.* ¶ 10.

Plaintiffs' third claim for injunctive relief is for further restrictions on the size of Conibear traps. *Pls.' Mem.* at 27. They demand the Court restrict Conibear traps to a width of no more than four inches in the current and expanded WMDs. Regarding the inclusion of additional WMDs, however, the November 17, 2008 lynx death occurred in WMD 2, which is already covered by the existing regulations, and the Plaintiffs have not otherwise made the case for expansion.

### i.      Leghold Traps

At this stage in the proceedings, the Court cannot find that the Plaintiffs have sustained their burden to demonstrate the balance of relevant impositions and the public interest justifies the full range of relief the Plaintiffs have requested. In the absence of evidence of actual harm from the current restrictions on leghold traps and in the absence of convincing evidence that the current WMDs should be expanded, the Court declines to exercise its equitable authority on either of these issues. The Court has countervailing affidavits from experts and no justifiable

basis to find one more persuasive than another.  Whether upon further evidentiary development a clearer factual resolution becomes possible depends upon the parties, not the Court.  At this point, however, the balance of the relevant impositions and the public interest in maintaining the status quo regarding leghold traps and the geographic area covered by the current restrictions substantially outweighs the benefits of granting the requested equitable relief.

### ii.   Conibear Traps

With the November 17, 2008 killing, however, a different calculus must be applied to Conibear traps.  The lynx's death on November 17, 2008 exposed an unanticipated hole in the state's regulatory scheme, which the state, the Trappers, and the Plaintiffs agree should be closed.  Dr. Elowe's confident prediction that "given the new restrictions on killer-type traps, it is unlikely that lynx will be caught in the future by such traps," *Elowe Aff.* ¶ 88, turns out to have been overly optimistic.  The current rules require that a Conibear trap be set at least four feet above the ground or snow level "so long as such traps are affixed to a pole or tree that is at an angle of 45º or greater to the ground and that is no greater than 4 inches in diameter at 4 feet above the ground or snow level."  *Consent Decree* ¶ 5(e).  These requirements were imposed with an understanding of lynx habits and climbing abilities and it was thought that they successfully made Conibear traps inaccessible to Canada lynx.

Perhaps relying on common sense, the rules did not expressly provide that the area surrounding the Conibear trap should not provide access to the trap nor did they provide that the forty-five degree angle for the pole or tree be maintained from the ground to the trap.  In reviewing the incident report and the photographs, if the setting of the trap in the November 17 incident was not prohibited by regulation, it should have been.

The state of Maine has acknowledged as much and has suggested that it will promulgate rules for the next trapping season to address the omission in its current regulatory scheme.  The Plaintiffs quite reasonably question why an emergency regulation should not be promulgated to avoid similar takes for the rest of this trapping season.  In the Consent Decree leading to the resolution of the API suit, the Commissioner agreed to use "whatever regulatory means are necessary, including, if necessary, emergency rulemaking procedures" to restrict trapping activities.  *Id.* ¶ 5.  The state has not explained why such emergency rulemaking procedures would not be available to address what all the parties, including the Trappers, agree is a regulatory gap, and under federal law, it falls to the Court to make certain the state's protective scheme "cannot continue insofar as its operation is inconsistent with the intent of the ESA." *Coxe*, 127 F.3d at 168.  The Court is perplexed why the state has not proposed to act immediately during this trapping season to tailor its trapping regulations to assure compliance with federal law.[28]

In balancing the relative impositions, the Court strikes the balance heavily in favor of the lynx.  There may be an incremental imposition on the state of Maine to promulgate now what it intends to promulgate in the future, but the state has not raised procedural difficulties in emergency rulemaking as a factor and in the API suit, it expressly agreed to take such measures when necessary.  By contrast, the imposition on the lynx is captured by the photograph of the dead lynx hanging from a Conibear trap.

### 2.    Weighing the Factors

The troublesome circumstances of the November 17, 2008 lynx death are sufficient to convince the Court that the gap in the Conibear trap regulations constitutes a violation of the

---

[28] The Court acknowledges that the parties have had a limited time within which to respond to the November 17, 2008 incident and it may be that the state is now considering emergency rulemaking.

ESA that requires federal injunction.  Although only one lynx has been subject to a take, it is reasonably foreseeable that other lynx will be subject to future takes in the event the regulations are not amended.  The sole question is not whether the current regulations are inadequate, the state agrees they are; it is not whether they should be amended, the state agrees they should; it is only when the amendments to the regulations should be made effective.  The state says additional protection can wait until next year.  However, as the November 17, 2008 incident confirms, the risk to the lynx is present today.  The Court concludes the ESA requires greater urgency.

To formulate and implement the precise response is beyond the limits of this Court's proper authority.  The state has proposed changes in the placement of Conibear traps and in the means of measurement for the degree of incline for the pole or tree on which the trap is located. The obligation to assure that the current size and placement restrictions on Conibear traps comply with the ESA rests with the state of Maine and the Court expects the state to meet its obligations forthwith.  It would be beneficial, though not mandatory, for the state to examine whether the current five-day interval between setting and checking a trap is too long.  The interval was clearly too long for the lynx found on November 17, 2008, but the Court has no evidence to assess how long is appropriate. The Court does not presuppose any particular answer.

Whether the current restrictions on leghold traps comply with the ESA and whether the trapping and ensuing harm to lynx under these restrictions affect the species are matters that remain very much in dispute.  On these matters, the Court declines to enjoin the state, because it is not convinced that the current leghold regulations represent a harm to the lynx as a species

within the meaning of the ESA and, unlike the Conibear regulations, there is no proposal that is likely to have a minimal impact on the trappers' side of the equation.

A final factor is the pending ITP application. The parties could not agree on how long it will take the USFWS to resolve the state of Maine's application. It will certainly be more than a few months, which means the application will remain unresolved past the end of the 2008 trapping season; it is unclear whether it will be unresolved by the 2009 trapping season. But, it seems unarguable that at some point, now that the ITP application has been filed, the USFWS will address the question of whether the state of Maine should be accorded an ITP for the lynx and, if so, under what conditions.[29] It is abundantly clear to the Court that the USFWS with its considerable agency expertise is in a much better position to address and resolve the merits of the parties' claims and counterclaims about the impact of trapping in the state of Maine on the Canada lynx. Further, the prospect of USFWS action before the 2009 trapping season may leave the window of controversy only the five remaining weeks of the 2008 trapping season.

The Court is reluctant to impose an ukase on trapping in the state of Maine based on dueling affidavits for the relatively brief interval before the USFWS acts, since to do so would be in derogation of the Supreme Court's recent admonition about the extraordinary nature of the injunction remedy and its re-emphasis that courts of equity should pay particular regard for public consequences before employing such a remedy. *Winter*, 2008 U.S. LEXIS 8343, at *30. Nevertheless, with fresh dramatic evidence of a lynx death under the current restrictions and the admitted need to amend those regulations, the Court exercises its equitable powers as narrowly as possible only to assure the state complies immediately with the ESA regarding Conibear traps.

---

[29] At oral argument, the attorney for the Plaintiffs seemed to agree that it is a foregone conclusion that the USFWS will issue an ITP, but will impose restrictions.

As to the remaining issues, the Court will await further evidentiary development as this motion for preliminary injunction hardens into a permanent injunction.

## III.     CONCLUSION

The Court GRANTS in part and DENIES in part the Plaintiffs' motion for preliminary injunction (Docket # 7).  The Court orders the state of Maine to immediately take all action necessary to avoid the trapping of Canada lynx in Conibear traps, including the promulgation of emergency regulations, if necessary, to assure that Canada lynx do not have access to Conibear traps either by way of the structure upon which the Conibear trap is placed or by way of adjacent structures.  The Court DENIES the Plaintiffs' motion for preliminary injunction to the extent they seek additional relief.  The Court DENIES the Trappers' motion for leave to file rebuttal declarations (Docket # 36).  The Court will schedule a telephone conference of counsel no later than seven days from the date of this decision to receive an update as to the state's response and to discuss the proper resolution of the pending demand for permanent injunction.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 26th day of November, 2008

64