UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| ANIMAL WELFARE INSTITUTE, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CV-08-267-B-W |
| | ) | |
| ROLAND D. MARTIN, | ) | |
| Commissioner of the Maine Department of | ) | |
| Inland Fisheries and Wildlife, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Court denies the Plaintiffs' request for permanent injunction against the state of Maine's current trapping regulations because it finds that the Plaintiffs have failed to prove the Canada lynx as a species will suffer irreparable harm if the injunction is not granted.

I.     **STATEMENT OF FACTS**

A.     **Canada Lynx, the State of Maine, and Federal Litigation in Maine**

On March 24, 2000, the United States Fish and Wildlife Service (USFWS) designated Canada lynx as a threatened species under the Endangered Species Act (ESA), 16 U.S.C. § 1531 *et seq.* 65 Fed. Reg. 16052 (March 24, 2000) (codified at 50 C.F.R. § 17.11). Since 1967, substantially before this designation, but consistent with it, the state of Maine has made it illegal to intentionally hunt or trap lynx. The state of Maine Department of Inland Fisheries and Wildlife (IF&W) permits trapping of other furbearing animals, including beaver, bobcat, coyote, fisher, fox, marten, mink, muskrat, opossum, otter, raccoon, red squirrel, skunk and weasel, and it regulates trapping by restricting the size, placement and types of traps, and by prescribing appropriate practices. *Stip. of Facts* ¶¶ 3, 7, 13 (Docket # 91) (*Stip.*). Even though it has long

been illegal in Maine to deliberately trap lynx, lynx have found their way into traps set for other legally-trapped animals and have been subject to incidental takes, which are themselves prohibited by federal law and regulation.  *See Animal Welfare Institute v. Martin*, 588 F. Supp. 2d 70, 98-99 (D. Me. 2008) (*AWI I*) (discussing takes within the meaning of the ESA)[1]; 50 C.F.R. § 17.3 (defining "incidental taking" as "any taking otherwise prohibited, if such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity").

Each trapping season, the current state of regulation in Maine has the effect of tolerating the incidental takes of a certain number of lynx, an intolerable state of affairs to animal rights advocates.   Twice in the last three years, they have come to federal court seeking declaratory relief and injunctions against Maine laws and regulations.   The first lawsuit, *Animal Protection Institute v. Martin*, Civil Docket No. 06-cv-128-B-W, resulted in a Consent Decree between the Plaintiff and the IF&W on October 4, 2007, which among other things, committed IF&W to maintaining regulations that restrict the type, size, and placement of traps in Maine.   *Id.* at 2-6 (Docket # 134) (*API*).

The Consent Decree, however, did not end the controversy, because lynx continued to suffer incidental takes even under the more restrictive regulations the Consent Decree affirmed.[2] On August 11, 2008, a similarly-named animal rights group, the Animal Welfare Institute (AWI) and a co-plaintiff the Wildlife Alliance of Maine filed this lawsuit seeking declaratory and injunctive relief against the IF&W.[3]  *Compl.* (Docket # 1).   The AWI sought a declaratory judgment that the IF&W was "violating Section 9 of the ESA by authorizing, administering and

---

[1] For ease of reference, the Court will use the federal supplement citation when referring to published orders in this case.  For unpublished documents, the Court will refer to docket entries.

[2] AWI and IF&W disagree about whether new regulations the State promulgated in June 2007 were caused by API's lawsuit.  *Def.'s Post-Trial Brief* at 9 n.5 (Docket # 104).  It does not matter.  The point is that the Consent Decree requires IF&W to keep in effect the then-existing Conibear trap regulations.  *API* at 3-4 (Docket # 134).

[3] When referring to AWI, the Court is also referring to co-plaintiff Wildlife Alliance of Maine.

allowing trapping practices that 'take' Canada lynx", an order enjoining the IF&W from "continuing to violate the ESA", and an award of attorney fees. *Id.* at 13.  On November 26, 2008, the Court issued a fifty-page Order on AWI's motion for preliminary injunction, granting the motion in part and denying it in part. *AWI I*, 588 F. Supp. 2d 70.

Observing that the state of Maine itself had acknowledged there was a gap in its regulatory scheme for Conibear traps, but that it wished to wait until the next trapping season to act, the Court ordered the state to "immediately take all action necessary to avoid the trapping of Canada lynx in Conibear traps, including the promulgation of emergency regulations, if necessary, to assure that Canada lynx do not have access to Conibear traps either by way of the structure upon which the Conibear trap is placed or by way of adjacent structures." *Id.* at 110. IF&W acted swiftly and on December 4, 2008, the Department adopted an emergency rule imposing further limitations on the manner in which Conibear traps could be legally set in Wildlife Management Districts 1 – 11.[4]  Letter from Christopher C. Taub, Assistant Atty. Gen. State of Maine, to Hon. John A. Woodcock, Jr. (Dec. 4, 2008) (Docket # 60) (*Taub 2008 Letter*). Within two weeks of the Order, however, two Canada lynx were found dead as a result of encounters with Conibear traps, and AWI moved for an emergency temporary restraining order. *Pls.' Mot. for Emergency TRO* (Docket # 63).  The Court denied the motion. *Animal Welfare Institute v. Martin*, 588 F. Supp. 2d 110 (D. Me. 2008) (*AWI II*).

## B.   The Motion for Permanent Injunction

To prevent further incidental takes of Canada lynx, AWI sought the issuance of a permanent injunction against the state of Maine, and in mid-April and late June, 2009, the Court held six days of hearing in which the parties presented exhaustive testimonial and documentary

---

[4] Conibear traps are also referred to as killer-type traps.  The Court uses the more neutral term, although the Court is certainly aware that the purpose of this trap, whatever its name, is to kill the animal.

evidence.   Following the hearing, AWI expressly asked for injunctive relief that would "(1) prohibit the use of leghold traps on land in the identified lynx WMDs as well as in WMD 7 where . . . lynx have been identified as present and have been trapped; and (2) prohibit the use of killer-type traps with an opening of more than four inches in both ground and elevated sets." *Pls.' Post Hearing Brief* at 47-48 (Docket # 99) (*Pls.' Br.*).   The State posited a series of defenses.   *Def.'s Post-Trial Brief* (Docket # 104) (*Def.'s Br.*).   A group of intervenors consisting of a sportsmen's alliance, trapper associations, and trappers (Trappers) also submitted a post-trial brief.   *Def.-Intervenors Post-Trial Brief* (Docket # 105) (*Trappers' Br.*).

## II.   DISCUSSION

### A.   The Court's Approach

The complexities of the intersection of the Canada lynx, trapping in Maine, and the ESA are not unknown to the Court.   To preserve their positions on appeal, the parties continue to press some arguments the Court has extensively addressed; to avoid repetition, the Court expressly references and incorporates its prior decisions.   *AWI I*; *AWI II*.   The Court carefully reviewed the newly-argued positions of the parties on previously-decided issues to determine whether new authority requires new analysis, and if so, the Court has addressed it.   Otherwise, the Court will not replow old ground.

AWI, however, has raised some new issues in its motion for permanent injunction.   At the hearing, in addition to presenting a plethora of data and detailed expert testimony on the Canada lynx in Maine, AWI focused its energies on three critical issues:   1) whether and the extent to which Maine's current trapping scheme causes incidental takes of lynx; 2) whether the rate and nature of incidental takes threatens the species; and, 3) whether in evaluating the balance of hardships and public interest factors for the issuance of injunctive relief, the Court should

consider the potential economic impact on the trappers and potential impact on lynx from increased predation and competition. Some issues are purely matters of law; others mix legal determinations with factual findings.

### B.    Standard for Injunctive Relief

To issue a permanent injunction, the Court must find that:

> (1) plaintiffs prevail on the merits; (2) plaintiffs would suffer irreparable injury in the absence of injunctive relief; (3) the harm to plaintiffs would outweigh the harm the defendant would suffer from the imposition of an injunction; and, (4) the public interest would not be adversely affected by an injunction.

*Asociacion de Educacion Privada de P.R., Inc. v. Garcia-Padilla*, 490 F.3d 1, 8 (1st Cir. 2007). The party seeking relief bears the burden of demonstrating that these factors weigh in its favor. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). Injunctive relief is "an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 129 S. Ct. 365, 376 (2008). A judge should exercise the authority to grant injunctive relief "sparingly." *Mass. Coalition of Citizens with Disabilities v. Civil Def. Agency & Office of Emergency Preparedness*, 649 F.2d 71, 76 n.7 (1st Cir. 1981).

### C.    Whether Maine's Current Regulatory Scheme Results in Indirect Takes of Canada Lynx

Section 9 of the ESA makes it unlawful for any person to "take any [endangered] species within the United States." 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take": "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, *trap*, capture, or collect, or attempt to engage in any such conduct." 16 U.S.C. § 1532(19) (emphasis added). "Take" is "defined . . . in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife." *AWI I*, 588 F. Supp. 2d at 98 (quoting

*Strahan v. Coxe*, 127 F.3d 155, 162 (1st Cir. 1997)).  Further, "[t]rapping that causes harm is subsumed under 'harm' and by adding the term 'trap,' Congress must have intended a meaning distinct from 'harm'" *Id.*  In *AWI I*, the Court concluded that "even if a lynx is harmlessly trapped, it has been subject to a prohibited take under the statute." *Id*.

AWI reiterates the position it already won.  *Pls.' Br.* at 2-5.  In *AWI I*, the Court found that Maine's current regulatory scheme results in prohibited incidental takes of Canada lynx; there is no reason to change its earlier conclusion.  What has changed since the November 26, 2008 decision on AWI's motion for preliminary injunction is that the state of Maine has tightened its regulations of Conibear traps; state regulation of leghold traps has remained unchanged.  The Court briefly addresses each.

### 1.    Conibear Traps

On November 17, 2008, a Canada lynx found its way into a Conibear trap, caught its paw in the trap, and died of exposure, hanging from the limb.  *AWI I*, 588 F. Supp. 2d at 81-83 (discussing the November 17, 2008 incident).  The disturbing death of this lynx uncovered a gap in the State's regulation of Conibear traps.  *Id.*  Although the regulations carefully provided that a trapper must place a Conibear trap on a tree or pole that a lynx could not climb, they failed to explicitly prevent a trapper from placing a Conibear trap adjacent to other  trees and objects the lynx could climb.  Although the placement of the Conibear trap that killed the lynx on November 17, 2008 violated all common sense, it had been legally set under existing Maine regulations. The Court ordered the State to take immediate action to avoid continuing violations of the ESA. *Id.* at 110.  On December 4, 2008, the IF&W promulgated an emergency rule that "clarifie[d]

that no objects likely to be climbed by lynx are any closer than 4 feet away from the trap."[5]

*Taub 2008 Letter* at 3 (*Rule-Making Cover Sheet*, *Basis Statement*).

According to IF&W records, since 1999, six lynx have been captured in Conibear traps. *Stip.* ¶ 33, 63, 71-73.  Four lynx of these lynx were captured in Conibear traps between 1999 and June 2007 when IF&W promulgated new Conibear trap regulations.[6]  Dr. Elowe testified that none of these traps was set in compliance with current Conibear trap regulations.  *Trial Tr.* 608:23-25; 609:1-18.  Two lynx were captured and died in Conibear traps in 2008.  *Stip.* ¶ 33. Dr. Elowe testified that neither of these traps was legally set.  *Trial Tr.* 597:3-5; 598:8-15; 600:14-20.  Since the State's emergency promulgation of more restrictive Conibear trap regulations, there have been no reports of incidental takes of Canada lynx from legally-set Conibear traps.[7]  AWI itself admits that "[n]o lynx have been reported trapped in killer-type traps (also called Conibear traps) since December 2008, when the DIFW amended its regulations governing their use."  *Pls.' Br.* at 3.

After evaluating the evidence, the Court finds that AWI has not demonstrated that Maine's current Conibear trap regulatory scheme is likely to cause incidental takes of Canada

---

[5] On the same day, December 4, 2008, a dead lynx was found about fifty yards from an illegally set Conibear trap. *AWI II*, 588 F. Supp. 2d at 112.  The Plaintiffs moved for an emergency temporary restraining order, but the Court concluded that the trapper's illegal setting of the trap broke the causal link between the incidental take and the state regulatory scheme.  *Id.* at 113-14.

[6] The June 2007 rule limited the use of Conibear traps in Wildlife Management Districts 1 through 11 to traps set under water or affixed to a pole or tree at least four feet above the ground or snow level on a pole or tree no greater than four inches in diameter and at an angle of 45 degrees or greater to the ground.  *Def.'s Ex.* 8.  The rule allowed Conibear traps with an inside jaw spread of no more than five inches to be used as long as they were set 1) to be partially covered by water at all times; 2) under overhanging stream banks; or 3) as "blind" traps.  *Id.*  The rule defines a "blind set" as "any set designed to catch a wild animal, without the use of bait, lure or visible attractor, by intercepting the animal as it moves naturally through its habitat.  Bait, lure and visible attractor do not include animal dropping (scat) or urine."  *Id.*

[7] This is not altogether surprising.  The trapping season in 2008 in Maine ran from early November to the end of December.  It is during the early weeks of the season that Canada lynx are most vulnerable, and IF&W did not promulgate the more restrictive regulation until December 4, 2008.  In 2009, there was an early trapping season for coyote and fox only that ran from October 18 to October 31, and the trapping season for the remaining species began on November 1, 2009 and will continue to December 31, 2009.  It is early to conclude that the more restrictive Conibear regulations will avoid incidental takes of Canada lynx, but it is equally true that it is early to conclude that they will not.

lynx.[8]  The Court accepts Dr. Elowe's testimony that none of the lynx captured in Conibear traps since 1999 was caught in traps that would be legal under Maine's current regulatory scheme. Accordingly, the Court concludes that AWI has failed to demonstrate a likelihood of success on the merits as to Conibear traps.  *Winter*, 129 S. Ct. at 376 (requiring plaintiff "to demonstrate that irreparable injury is *likely* in the absence of an injunction"); *see also American Bald Eagle v. Bhatti*, 9 F.3d 163, 166 (1st Cir. 1993) (citing cases for the proposition that injunctive relief is granted "only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species").

### 2.   Leghold Traps

In contrast, the parties agree that lynx have been and will continue to be caught in leghold traps even when set in compliance with state law. The parties stipulate that "two lynx were incidentally caught in foothold traps in 2008. . . . These two lynx were trapped in foothold traps set legally pursuant to the trapping regulations implemented pursuant to the [2007] Consent Decree."  *Stip.* at ¶¶ 7, 31.   Further, on October 23, 2009, Assistant Attorney General Christopher Taub confirmed that a Canada lynx had been "incidentally captured in a foothold trap on October 21, 2009".[9]  Letter from Christopher C. Taub, Assistant Atty. Gen. State of Maine, to Hon. John A. Woodcock, Jr. (Oct. 23, 2009) (Docket # 112) (*Taub 2009 Letter*).

---

[8] Whether the current Conibear regulations will prevent incidental takes of lynx was strenuously controverted by the parties.  Relying primarily on the expert testimony of Dr. Paul Paquet, AWI presented evidence from which the Court could find that even with the more restrictive regulations, Conibear traps are likely to incidentally take lynx. *Pls.' Br.* at 7-9.  The Court is not convinced.  The Court acknowledges that it remains possible that the enhanced restrictions will fail to prevent incidental takes, but AWI has not demonstrated that it is more likely than not that Canada lynx will be caught in Conibear traps under Maine's more restrictive regulatory scheme.  The jury is still out.

[9] The 2009 Taub letter revealed that after the lynx was caught in a foothold trap, a person bird hunting in the area shot the lynx. *Taub 2009 Letter*, *Incidental Take Report* at 1.  AWI responded on November 6, 2009.  Letter from Judith M. Brawer, Esq. to Judge Woodcock (Nov. 6, 2009) (Docket # 114, 115).  The shooting of the lynx aside, the lynx's capture in a leghold trap gives further credence to the view that Canada lynx will be subject to incidental takes in leghold traps under Maine's current regulatory scheme.

Faced with persistent evidence of incidental takes of lynx in leghold traps, IF&W concedes that "it is likely that lynx will continue to be caught in foothold traps." *Def.'s Br.* at 12. Because these incidental takes have occurred and are likely to continue to occur, the Court concludes that AWI has met its burden of proof to establish it is likely Canada lynx will be subject to incidental takes from leghold traps in contravention of the ESA under Maine's current regulatory scheme.

**D.      Whether the Irreparable Injury Requirement for the Issuance of an Injunction Is Satisfied by Harm to an Individual Endangered Animal or Harm to the Species as a Whole**

In *AWI I*, the Court observed that "the correct test for irreparable injury is whether the Plaintiffs have demonstrated that irreparable injury is likely if the injunction is not granted." *AWI I*, 588 F. Supp. 2d at 102.  Noting the tension between the "uncompromising 'death of one member' view in *Loggerhead Turtle* and the broader 'species as a whole' view in *Water Keeper*," the Court adopted a "nuanced" approach which recognizes that "the death of a single animal could constitute a violation of the ESA that would call for the full exercise of a court's injunctive authority, and at the same time, there may be circumstances where the death of one member is an isolated event that would not call for judicial action." *Id*. at 106

**1.      AWI's View**

AWI takes issue with the Court's ruling on irreparable harm in *AWI I*.  Specifically, AWI disputes the Court's evaluation of the irreparable harm prong "within the greater context of the purpose of the ESA" and its reliance in *AWI I* on *Water Keeper Alliance v. United States Department of Defense*, 271 F.3d 21 (1st Cir. 2001).  *Pls.' Br.* at 12.  AWI contends that *Water Keeper* does not require a "species as a whole" approach when evaluating irreparable harm.  *Id*.

AWI points out that § 7 of the ESA, not § 9 was at issue in *Water Keeper*.  In *Water Keeper*, AWI writes, "a showing of impact to the species – as opposed to the death of one single member – was necessary in order to impose the Section 7 consultation that Water Keeper claimed was necessary.  Section 9 does not require evidence of impact to the species in order to find, and prevent a 'take.'"  *Id*. at 12-13.  In essence, AWI's argument is that the irreparable harm standard depends upon the applicable ESA section.  *Id*. at 10.  "Section 9 itself, [] prohibits taking *individual* members of a species" while "[o]ther sections of the ESA, such as 7 and 10, address actions that harm the entire species."  *Id*.

AWI's second argument against the "species as a whole" approach relates to the likelihood of success on the merits.  *Id*. at 13.  AWI argues that because the plaintiffs in *Water Keeper* failed to satisfy the first prong of a preliminary injunction, likelihood of success, the *Water Keeper* court placed the case outside the *Tennessee Valley Auth. v. Hill,* 437 U.S. 153 (1978) (*TVA*) context, and required a showing of "irreparable harm 'apart from the harm that [the plaintiffs] argue is inherent in a procedural violation of the ESA's consultation requirements.'"  *Id*. at 13 (citing *Water Keeper*, 271 F. 3d at 34).  AWI contends that unlike the plaintiffs in *Water Keeper*, it has demonstrated a likelihood of success on the merits, and thus "no additional showing of irreparable harm outside of the context of Section 9 is necessary."  *Id*. at 13-14.  This position, AWI contends, is supported by *Animal Protection Institute v. Holsten*, 541 F. Supp. 2d 1073 (D. Minn. 2008) "which did not require a showing of harm in order to grant injunctive relief, but only a likelihood of future takings."  *Id*. at 14.

AWI also seeks to distinguish the cases that supported the Court's determination of the irreparable injury standard in *AWI I*.  *Id*. at 14-17.  The Plaintiffs say that *Coxe* is different because the take at issue was "harm" not "trap."  *Id*. at 14-15. According to AWI, the First

Circuit's discussion of "harm" was in the context of its take definition, as opposed to in the context of the "irreparable harm" injunction requirement. *Id*. at 15. "Plaintiffs' may have to show irreparable harm within the meaning of the injunction standard as it is applied to the ESA," but because this case involves a "trap" as opposed to "harm" this showing "does not rise to the level of harm as defined by the ESA." *Id*.

AWI distinguishes for various reasons other decisions the Court relied upon in *AWI I*. It says that, unlike the instant case, the Ninth Circuit affirmed the denial of the injunction in *National Wildlife Federation v. Burlington Railroad*, 23 F.3d 1508 (9th Cir. 1994), because the plaintiff had failed to demonstrate a likelihood of future harm. *Id*. at 16. Similarly, it argues that *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F.3d 781 (9th Cir. 1995) "does not concern the standard for irreparable harm, but the requirement for showing take through 'harm' within the meaning of the ESA." *Id*. Also, AWI notes that in *American Bald Eagle v. Bhatti*, 9 F.3d 163 (1st Cir. 1993), "the Court was concerned with whether there was 'actual' harm as defined by the ESA, not whether there was harm to the species." *Id*. at 16-17.

AWI's final argument is that an irreparable harm standard that requires a "species as a whole" evaluation would impede the USFWS's enforcement ability because "courts would not be able to enjoin private landowners or other third parties from violating the ESA unless the FWS could prove that a threat to the species survival would result." *Id*. at 17. In addition, AWI says, such a standard would contravene § 9, "which protects individual species members from takes and other activities such as importation, exportation, sale, transport, and possession." *Id*.

AWI maintains that "a taking of a single protected species" is the appropriate irreparable harm standard and the trapping of a single lynx is all that is required. *Id*. at 15-16. (citing

*Loggerhead Turtle v. County of Volusia County*, 896 F. Supp. 1170, 1180 (M.D. Fla. 1995).

### 2.    IF&W's View

IF&W "agrees that even a momentary completely harmless detention of a lynx can be a take in violation of the ESA." *Def.'s Br.* at 16.  However, IF&W contends that the take must also result in irreparable harm. *Id.* at 13.  "Proving a violation [of the ESA] does not, by itself, entitle plaintiffs to injunctive relief.  They still must at least prove irreparable harm, and the fact that there has been a take does not mean that there has been irreparable harm." *Id.*

IF&W argues that "proving a violation of the ESA, whether procedural or substantive, does not obviate the need to prove irreparable harm." *Id.* at 15.  For support of this argument IF&W cites a number of cases involving "ongoing procedural violations of the ESA" which still required evidence of harm. *Id.* at 14-15 (citing *Water Keeper*, 271 F.3d 21, *Oregon Natural Desert Ass'n v. Kimbell*, 2008 U.S. Dist. LEXIS 68758 (D. Or. Sept. 5, 2008), *Pac. Coast Fed'n of Fishermen's Ass'ns v. Gutierrez*, 606 F. Supp. 2d 1195, 1205-06 (E.D. Cal. 2008), and *Alabama v. United States Army Corps of Eng'rs*, 441 F. Supp. 2d 1123, 1135 (N.D. Ala. 2006) (*Alabama Mussels*)).  IF&W suggests that "only a procedural violation is at issue here.  IF&W is permitting trapping without having obtained an Incidental Take Permit but without any evidence that a listed species is being harmed." *Id.* at 15.  From IF&W's viewpoint, this case is "similar to those where agencies engaged in activities that could potentially impact listed species without complying with procedural requirements." *Id.*

IF&W also disputes that "*Coxe* supports [AWI's] argument that [it] need not show irreparable harm to obtain injunctive relief without evidence of a likelihood of harm." *Id.* at 16.  Instead, IF&W argues that a court does not "have the same discretion in determining whether to grant injunctive relief" and *Coxe* "was not suggesting that plaintiffs need not show irreparable

harm to obtain an injunction, only that courts do not have the same broad discretion that the [National Marine Fisheries Service] has to permit takes to continue." *Id.* Finally, IF&W takes the position that the irreparable harm within the injunction standard means irreparable harm to the species as a whole. *Id.* at 17-18. In support, IF&W cites *Water Keeper*, *Pacific Coast Federation*, and *Alabama Mussels*.

### 3.   *Coxe* and Irreparable Harm

The Court has carefully considered AWI's arguments, but finds them unpersuasive. Instead, the Court continues to conclude that *Coxe* is authoritative in the First Circuit for determining irreparable harm.[10] Under *Coxe*, injunctive relief is not mandatory upon every take that violates the ESA. *Coxe*, 127 F.3d at 171 (observing that *TVA* rejected the proposition "that injunctive relief is mandatory upon a finding of a violation of the ESA"). The Court retains discretion and is "not mechanically obligated to grant an injunction for every violation of law." *Id.* (citing *TVA*, 437 U.S. at 193). *Coxe* went further and noted that even if "the activity at issue would have caused eradication of an entire endangered species if not enjoined," the district court was not required to issue an injunction so long as it ensured "that any violation would end." *Id.* Rather, the Court should look to whether the violation is likely to harm the species as a whole.[11] Although a single take could cause irreparable harm and require an injunction, there may also be

---

[10] Since *AWI I*, another district court weighed in on the irreparable injury standard. In the consolidated cases of *Defenders of Wildlife v. Salazar* and *Greater Yellowstone Coalition v. Salzar*, plaintiffs challenged the USFWS "2009 decision to designate and delist the northern Rocky Mountain gray wolf distinct population segment under the ESA." *Molloy Order* at 2-3. (Docket # 106). The plaintiffs moved for preliminary injunction to prevent scheduled wolf hunts in Idaho and Montana. *Id.* at 3. In the motion, the plaintiffs advanced a "low threshold" for the irreparable harm prong and argued that a taking of a single individual within a species satisfies this element. *Id.* at 10. After engaging in a thorough analysis, Judge Molloy rejected the plaintiff's argument, and concluded that "the measure of irreparable harm is taken in relation to the health of the overall species rather than individual members." *Id.* at 11-12.

[11] The Court is not alone. In addition to the First Circuit's determination that plaintiffs must show "how [the harm] may impact the species," *Water Keeper*, 271 F.3d 21 at 34, other courts have determined that "the court must consider the effect of the alleged take on the species as a whole." *Alabama Mussels*, 441 F. Supp. 2d at 1135; *see also Pac. Coast Fed'n of Fishermen's Ass'ns*, 606 F. Supp. 2d at 1210 (noting that "the approach taken . . . identifies 'irreparable harm' as 'significant' vis-a-vis the overall population").

instances where the take of an individual member has a negligible impact on the species as a whole.[12] *AWI I*, 588 F. Supp. 2d at 106.

The Court reiterates its view that the proper test for determining irreparable harm is effect on the species as a whole, not on individual members of the species, unless the take of an individual member has been demonstrated to affect the species as a whole.

### E.     Evidence of Irreparable Harm

#### 1.     Multiple Areas of Factual Disagreement

The Court turns to the crux of the extended evidentiary hearing – whether AWI demonstrated that the Canada lynx as a species is likely to suffer irreparable harm from incidental takes under Maine's current regulatory scheme.  AWI presented evidence of two types of harm to lynx caught in leghold traps:   physical injury; and, stress-related and behavioral injuries.  *Pls.' Br.* at 17-35.  AWI contends that the two types of harm, separately and together, are likely to affect the survivability of the lynx as a species in Maine.  *Id.* at 35-42.  IF&W and the Trappers acknowledge that lynx have been caught in leghold traps, but dispute the extent of the injuries and, more significantly, the effect of the injuries on the species as a whole.  *Def.'s Br.* at 12 (stating that "the State does not dispute that plaintiffs have demonstrated that it is likely that lynx will continue to be caught in foothold traps"); *Trappers' Br.* at 7 (stating that "[w]ith respect to foothold traps, it is likely that lynx will be caught in lawfully-set foothold traps in the future, but that alone is insufficient to establish liability under *Coxe*").

---

[12] A comparison between *Alabama Mussels* and *Coxe* illustrates this point.  *Alabama Mussels* concerned four species of threatened and endangered mussels.  *Alabama Mussels*, 441 F. Supp. 2d at 1125.  Although it is theoretically possible that a take of one mussel could endanger the entire species, it seems more realistic that if a mussel species reached the point where one death would eliminate the entire species, the species would be doomed to extinction in any event.  *But see Rio Grande Silvery Minnow v. Keys*, 333 F.3d 1109 (10th Cir. 2003) (discussing ESA protection for a species of minnow on the brink of extinction).  By contrast, as *Coxe* reveals, the calculus is different with the Northern Right Whale, since according to *Coxe*, there were only three hundred individual whales in the species as of 1997.  127 F.3d at 158.  The ESA does not require the courts to treat mussels as if they are whales, or whales as if they are mussels.

The parties fully aired their differences during the six-days of evidentiary hearing.  AWI relied upon the expert testimony of Dr. Paul Paquet and Camilla Fox; IF&W relied on the testimony of Dr. Kenneth Elowe; the Trappers called Dr. Craig McLaughlin and Dana Johnson, President of the Maine Trappers Association.  The parties introduced thousands of pages of documents, and vigorously controverted an array of factual issues, some simple, others complex, including:

1)  The current size of the Canada lynx population in the state of Maine;

2)  The interrelationship between the Canada lynx population in Maine and the neighboring lynx population in Canada;

3)  The cyclical nature of the lynx population in Maine;

4)  The cyclical nature of the snowshoe hare population in Maine and its implications on the lynx population in Maine;

5)  The impact of forestry practices in Maine, including clear cutting, on the lynx population;

6)  The extent of competitive species, such as fisher and coyote, predation on lynx;

7)  The carrying capacity of the lynx population in Maine;

8)  Whether the lynx population in Maine has sufficient genetic diversity;

9)  The validity of lynx population modeling performed by IF&W;

10)  Whether lynx are attracted to blind Conibear sets where scat or urine are used as attractants;

11) The extent to which leghold traps cause physical injuries to lynx;

12) The extent to which different types of leghold traps, such as "Soft Catch" traps, minimize physical injuries;

13) The impact of physical injuries to lynx on the survivability of the trapped animal;

14) Whether staked leghold traps or leghold traps with drags cause fewer significant injuries;

15) The extent to which an animal which has been trapped sustains stress-related and behavioral injuries, which affect its ability to survive; and,

16) The extent to which the Court should take into account the likelihood of unreported takes of lynx.

### 2.     The Analytic Method

Although the Court has considered the parties' contentions and has weighed the evidence, the Court will not expressly resolve each factual dispute.  As AWI put it, the parties are "at polar opposites" regarding even the most basic propositions.  *Pls.' Br.* at 49-50.  To resolve in writing each of the myriad of arguments would be unproductive.  Instead, to give the parties a sense for the Court's approach, the Court will review and resolve a few, more significant disputes.

### a.     The Total Lynx Population

Despite its centrality in the parties' dispute, the parties do not even agree on the number of lynx in the state of Maine.  This factual issue is obviously significant, since the number of recorded takes of lynx must be tested against the total lynx population to evaluate the impact of the takes on the species.  *See Pls.' Br.* at 36 (stating that "[t]he degree to which the loss of one individual affects a population depends on the size of the population to begin with").

Dr. Elowe, the State's expert, testified that IF&W estimates that Maine has "at least 650 breeding pairs.  Breeding adults, not breeding pairs."  *Trial Tr.* 554:19-21.  He explained that he was referring to a male or female lynx of breeding age or "over three years old."  *Id.* 554:22-25; 555:1.  The 650 figure does not include kittens or juveniles.  *Id.* 555:3-6.  Although an estimate,

Dr. Elowe agreed that he did not think it was likely that the actual figure is less than 650 and it could be more. *Id.* 555:24-25; 556:1-3. Dr. Elowe thought the total lynx population in Maine conservatively equals "a thousand or over animals." *Id.* 555:10-13.

AWI is intensely skeptical of Dr. Elowe's population estimates. In rebuttal, Dr. Paquet described Dr. Elowe's population modeling as "simplistic" and "rather crude." *Id.* 1182:21-24. He thought the population figures were "overinflated." *Id.* 1183:1-2. Dr. Paquet elaborated at length about his criticism of the State's population figures, describing it as "a very, very tenuous generalization and an extension of the model." *Id.* 270:9-10. AWI also pointed out that USFWS expressed concerns about IF&W's population modeling. *Pls.' Br.* at 39-40.

From the Court's perspective, AWI's criticisms of the State's methodology, however valid, do not entirely negate the probative value of Dr. Elowe's estimate. Moreover, there is no countervailing expert guidance from which the Court could reasonably determine a more accurate figure. *See Def.'s Br.* at 20 (stating that "[p]laintiffs' expert, Dr. Paquet, criticized IF&W's population estimates, but offered none of his own"). If the state of Maine had the burden of proof in this case, the State's population extrapolations might or might not make its case. But, here, the burden of proof is on AWI, and on the issue of the total lynx population, the Court finds that even if AWI has demonstrated that Dr. Elowe's estimates are not perfect, AWI has not established that it is more likely than not they should be ignored. In the absence of countervailing evidence, the Court accepts Dr. Elowe's testimony as to the likely total population of Canada lynx in Maine. In short, an absence of proof falls against the moving party, and the Court has approached this and other factual disputes in the same fashion, evaluating the evidence with a view toward determining whether AWI sustained its burden of proof.

### b.    Post-traumatic Stress Disorder Among Canada Lynx

Similarly, the Court does not find persuasive AWI's position on the question of stress-induced or behavioral injuries from trapping.  This was a major point of contention, since AWI argued that incidental takes have caused not only physical injuries to the lynx, but also "psychological, similar to post-traumatic shock in humans."  *Pls.' Br.* at 31.  To sustain its burden on the motion for permanent injunction, AWI added together the physical and psychological injuries to the lynx from trapping to demonstrate irreparable harm to the species. *Pls.' Br.* at 17-42.

In essence, AWI contends that when trapped, a lynx can suffer from "nonphysical injuries," which Dr. Paquet described as "[n]ot dissimilar from what we see in humans, an example being posttraumatic shock, for example, would be a traumatic injury that has repercussions."  *Id.* 143:11-22.  The Court does not discount Dr. Paquet's testimony that a lynx caught in a trap could experience heightened physical symptoms, such as a "rapid rate of breathing" or "elevated temperature – body temperature, rather than a lowered body temperature or normal."  *Id.* 145:1-9.  Ms. Fox also opined that "[s]tress and pain of capture cause significant changes in hormones, enzymes, and electrolytes, as well as muscle ph.  Trapped animals have increased levels of serum cortisol, indicating a stress response to being trapped."  *Id.* 352:23-25; 353:1-2.

But, Dr. Paquet went far beyond the rather commonsense contention that being trapped could cause an animal stress, which is expressed physically.  He testified that an initial trapping can lead to capture myopathy and death:

> It's a stress - - capture myopathy is a noninfectious disease of muscles that's precipitated by stress or a stressful event, trapping being one of those stressful - - stressful events that can precipitate myopathy.  It results in excess production of lactic acid because of a hyper[-]response or reaction to the trapping event so the

metabolic function of the muscles becomes anaerobic - - that meaning without oxygen, right - - and the byproduct of that is lactic acid, and then the lactic acid begins to accumulate, and the blood becomes acidic, and as a consequence of the acidic blood affects, again, the breathing and the oxygenation, which leads to the deterioration of the muscle and then the release of myoglobin in the muscle, which then can have broader effects, including kidney failure and dysfunction, as well as congestive lung problems.  I mean, there are a variety of outcomes, and as I said, can result in death.

*Id.* at 146:10-25.  Dr. Paquet testified that "the initial event is what triggered the cascade of deterioration, and then it was exacerbated by multiple captures."  *Id.* 148:12-14.

AWI thus contends that "[a]n acute response that does not result in death might affect the animal for a month or longer, and the current thinking among many researchers is that the trauma of being caught in a trap can affect the immune system in the long term.  Ultimately, stress-related injuries can result in impairment of the animal's fitness or even death."  *Pls.' Br.* at 32-33.

The Court is not convinced.  AWI's position anthropomorphizes the lynx.  It is not beyond the realm of imagination that the Canada lynx possesses human-like sensitivities and horrible memories about traumatic events in the past, which cause systemic deterioration, leading to debilitation and death.  But, the daily life of a mid-size predator in the woods of Maine is inherently stressful, one most humans would find overwhelmingly so, including the imperative to catch and eat elusive prey, the risk of being caught and eaten by more powerful, aggressive predators, and the exposure to harsh elements.   Where along the lynx stress scale being trapped and released by a human would compare to being chased and nearly caught, killed and eaten by a fisher or coyote is speculative, but if such stressful events caused a "cascade of deterioration," leading to death, it is a wonder the species has survived.

Further, the evidence reveals that some lynx, usually those who are aged, can become "trap happy," a circumstance that occurs with many animals.  *Trial Tr.* 876:6-25; 877:1-7.  Dr.

Elowe explained that the animal comes to realize that the benefit of easy food in the trap is worth the drawback of being trapped, and they are repeatedly found in traps. *Id.* 876:22-25; 877:1-7. It is difficult to square AWI's contentions about stress-induced or behavioral injuries from trapping with the same animal that can become trap happy.

From the evidence AWI has amassed, the Court does not find it is more likely than not that trapping as regulated in Maine causes stress-induced or behavioral injuries in Canada lynx.[13]

### c.      Physical Injuries and the Survival of the Species

Another major source of controversy is the extent of physical injuries the lynx sustains when caught in a leghold trap. When caught in a trap, it is possible that a lynx could suffer a wide range of injuries. IF&W itself distinguishes between major physical and minor physical injuries, defining major injuries as requiring veterinarian care, including broken bones, tooth injuries (an injury that deeply disturbs the roots and nerves), mouth injuries (excessive bleeding, swelling, redness, odor), unresponsiveness, severe bleeding (pulsing, spraying blood), laceration, puncture wound (extending into the body cavity or with swelling), frozen digits, hypothermia, and dislocation of a shoulder or hip. *Pls.' Ex.* 70 at 291-92; *Def.'s Ex.* 7 at 2-3. It categorizes minor injuries as not requiring veterinarian care, including edema (swelling of capture foot), mouth injuries (minor bleeding), laceration (longitudinal on the limb and only penetrating the dermis of the skin), broken toes, minor bleeding, and puncture wounds (in limb with no swelling or edema). *Id.*

The parties disagree, however, as to whether a lynx can be trapped and released without sustaining any harm. Dr. Paquet testified that in his experience, he had "not seen a lynx that has

---

[13] For example, in support of his hypothesis, Dr. Paquet cited a study that found "that baseline information that was being collected in research on dolphins was being confounded by the capture event itself." *Trial Tr.* 149:21-23. Without more, the Court is unwilling to extrapolate the capture experience of dolphins to the trapping experience of lynx.

been trapped in a foothold trap that did not incur an injury of some sort. There's always an injury." *Trial Tr.* 60:21-25; 61:1-2. Dr. Elowe, however, pointed out numerous instances where lynx had been caught in foothold traps, sustained minor injuries within the IF&W definition, and lived for months and sometimes years afterward. *Id.* 610:5-25; 611:1-25; 612:1-25; 613:1-22. There is also evidence that if properly rehabilitated, a lynx can recover even from a major injury. *Pls.' Ex.* 70 at 96 (describing a lynx that suffered a broken leg from being caught in a leghold trap, was rehabilitated, and lived for another 5.5 years).

There is some statistical evidence in Maine about what happens to the lynx after it is caught in a foothold trap. Between 1999 and 2006, according to IF&W records, approximately 30 lynx were caught in leghold traps. *Trial Tr.* 621:11-21. According to Dr. Elowe, IF&W biologists were able to assess "a little less than half" of the captured lynx. *Id.* 621:22-25; 622:1-2. None of the thirty captured lynx was directly killed from being trapped. *Id.* 622:3-5. One required veterinarian care. *Id.* 622:6-8.

Since IF&W adopted new regulations in June 2007, recreational trappers have caught eight lynx in leghold traps. *Id.* 610:5-10. IF&W biologists examined five of them. *Id.* 610:11-12. One lynx sustained a minor skin laceration that did not require veterinarian care, *Id.* 611:2-6, *Def.'s Ex.* 29; another lynx had no reported injuries, *Trial Tr.* 612:10-15, *Def.'s Ex.* 31; a third had a "small drop of blood around the bottom of the foot of the pad," *Trial Tr.* 613:6-9, *Def.'s Ex.* 34; a fourth had no injuries detected, *Trial Tr.* 613:20-22, *Def.'s Ex.* 36; and, a fifth sustained a "small laceration the size of a pea and a very slight limp upon release." *Trial Tr.* 614:7-10, *Def.'s Ex.* 37.

Since 1999, IF&W itself has engaged in a radio-collaring program in which it has captured approximately 100 lynx in foothold traps. *Trial Tr.* 622:15-22; 624:2-7. Despite 100

leghold captures, only one lynx has required veterinarian care. *Id.* 624:22-24. Many lynx in the radio-collar program have been trapped repeatedly. *Id.* 654:2-13 (lynx captured 37 times, 7 in leghold traps); 656:1-2; 656:23-25 (lynx captured 40 times, 5 times in a foothold trap); 657:5-20 (lynx captured 4 times, three in leghold traps); 659:23-25 (lynx captured 4 times, 3 in leghold traps). Some lynx had litters of kittens after being caught in leghold traps. *Trial Tr.* 659:2-10; 661:4-9. In sum, IF&W records and Dr. Elowe's testimony suggest that lynx can be caught in leghold traps, sustain minor injuries, return to the wild, and continue to live successfully and to propagate after being trapped.

Faced with this evidence, AWI questions its accuracy. First, it notes that "many injuries are difficult to detect." *Pls.' Br.* at 23. Dr. Paquet confessed that despite his expertise and experience, he would not "feel completely competent" to test a lynx for injuries in the field without having a veterinarian present. *Trial Tr.* 39:8-15. Second, AWI contends that simply because a lynx was released without apparent injury, it is illogical to conclude it had no injury at all. *Pls.' Br.* at 23-24. In fact, AWI operates under the contrary assumption that once trapped, a lynx has sustained some type of injury. *Id.* The AWI attacks Dr. Elowe's conclusions about whether captured lynx fully recover from the trapping. *Id.* at 24-28. Third, acknowledging that the "impact of trapping on the long term fitness of lynx taken in recreational traps is largely unknown because they are not radio collared or monitored," AWI contends that the "lack of data as to the actual fitness of the lynx and their condition at the time of release should not lead to an assumption of no affect." *Id.* at 24, 28. Finally, AWI points out that "non-reporting is a problem and there are likely more lynx being taken than IF&W admits." *Id.* at 5.

In proving its case, AWI is handicapped by an absence of its own specific evidence, and, rather than positing the results of its own Maine-based lynx-specific studies, it resorts to

undercutting IF&W's data, and to extrapolating its generalizations to the lynx in Maine.  From the Court's perspective, this amounts to a failure of proof.  Again, in the context of its motion for permanent injunction, where it has the burden, AWI cannot make a virtue out of what it lacks and has not sustained its burden only by attacking the defense.

### 3.    A Failure of Proof

To the extent AWI presented affirmative evidence, it consists largely of generalized studies and expert opinions arrayed against IF&W's Maine-based and lynx-specific data and experts.   For example, to buttress her opinion that trapping causes long-term physical and behavioral injuries, Ms. Fox cited a chapter entitled "Short- and Medium-Term Evaluation of Foothold Trap Injuries in Two Species of Fox in Saudi Arabia" by Philip J. Seddon, Yolanda Van Heezik, and Richard F. Maloney published in the book Mammal Trapping by Gilbert Proulx.  *Trial Tr.* 355:17-21; *Pls.' Ex.* 44.  Ms. Fox testified about the study's findings:

> Essentially, they look at capture-related survival of two species of fox in Saudi Arabia, and they found that only 8 percent of Ruppell's foxes captured in padded leghold traps were alive six months after release compared to 48 percent of foxes caught in cage traps.

*Trial Tr.* 356:3-7.  Ms. Fox said that the fox study in Saudi Arabia was relevant to the Canada lynx in Maine because "regardless of the species," the "relevance is that postrelease survival was compromised as a result of being trapped in padded leghold traps, and the authors conclude that as a result of being compromised by those traps, they had reduced fitness and reduced ability to survive, looking at both starvation and their susceptibility to predation as well.  And so we see that.  We see that happening in Maine in terms of the potential for reduced fitness postrelease from trapping, and when we look at the trends of increased starvation, increased predation, that could indicate that these animals are compromised from - - potentially as a result of capture-related effects."  *Id.*  356-57: 17-7.

Even assuming Ms. Fox correctly characterized the study,[14] evidence of how an extremely small sample of Ruppell's foxes, in this case only 13, responded to being caught in a leghold trap in the Saudi Arabian desert is not particularly compelling evidence for how a Canada lynx would respond to a leghold trap in the woods of Maine.[15]  Although there may be some validity in relying on a study of Ruppell's foxes in the Arabian Peninsula to prove a point about Canada lynx in the state of Maine, data about Canada lynx in Maine are much more persuasive.

The Ruppell fox study is discussed in detail to illustrate a point.  AWI's case consisted of numerous similar studies that have an attenuated relationship to the lynx in the state of Maine.[16]

---

[14] The study states:

> Only 1 (8%) of 13 Ruppell's foxes that had been caught by foothold trap were recaptured in cage traps at or after six months; none were confirmed present in the area 12 months after foothold trapping.  In contrast, 48% (27 out of 56) of Ruppell's foxes that had been caught in cage traps only were confirmed alive six months after their first capture (Fisher's exact, $P = 0.01$); their survival dipped to 36% after 12 months.

*Ch. 4*, Short- and Medium-Term Evaluation of Foothold Trap Injuries in Two Species of Fox in Saudi Arabia at 74, *Pls.' Ex.* 44 at 74.  It would seem there is a difference between being "recaptured in cage traps at or after six months", which is what the study says, and being "alive six months after release," which is what Ms. Fox testified it says.

[15] For example, the authors state that an adult Ruppell's fox weighs between 1.3 and 2.2 kg (2.47 to 4.85 lbs), and they acknowledge that "[s]ubspecies of mammalian carnivore native to the Arabian Peninsula tend to be smaller and lighter than their counter-parts in more temperate climates, and are possibly at greater risk of suffering severe injuries during foothold trapping."  *Pls.' Ex.* 44 at 68.  By contrast, lynx are considered "medium sized cats, 75-90 cm long (30-35 inches) and weighing 8-10.5 kg (18-23 pounds)."  *Canada Lynx Conservation Assessment and Strategy* (Jan. 2000) at 5 *Pls.' Ex.* 42.

[16] *See* Final Environmental Document, Furbearing and Nongame Mammal Hunting and Trapping, State of California, The Resource Agency, Dep't of Fish and Game (April 22, 1993), *Pls.' Ex.* 7; Carlos Carroll, Interacting Effects of Climate Change, Landscape Conversion, and Harvest on Carnivore Populations at the Range Margin: Marten and Lynx in the Northern Appalachians, *Pls.' Ex.* 8; Jan Englund, A Comparison of Injuries to Leg-Hold Trapped and Foot-Snared Red Foxes, *Pls.' Ex.* 13; Barry K. Hartup, George V. Kollias, Matthew C. Jacobsen, Beth A. Valentine & Kevin R. Kinber, Exertional Myopathy in Translocated River Otters From New York, *Pls.' Ex.* 16; Erin Kennerly, Anne Ballmann, Stanton Martin, Russ Wolfinger, Simon Gregory, Michael Stoskopf & Greg Gibson, A Gene Expression Signature of Confinement in Peripheral Blood of Red Wolves, *Pls.' Ex.* 20; Kevin Kimber & George Kollias, Evaluation of Injury Severity and Hematologic and Plasma Biochemistry Values for Recently Captured North American River Otters (Lontra Canadensis), *Pls.' Ex.* 22; T.J. Keeger, P.J. White, U.S. Seal & J.R. Tester, Pathological Responses of Red Foxes to Foothold Traps, *Pls.' Ex.* 24; A. Mancia, G.W. Warr & R.W. Chapman, A Transcriptomic Analysis of the Stress Induced by Capture-Release Health Assessment Studies in Wild Dolphins (Tursiops Truncatus), *Pls.' Ex.* 28; and, Torbjorn Nilsson, Integrating Effects of Hunting Policy, Catastrophic Events, and Inbreeding Depression, in PVA Simulation:  the Scandinavian Wolf Population as an Example, *Pls.' Ex.* 35.

This is not to say that AWI relied exclusively on marginally relevant studies, but it is true that on crucial factual issues running to the heart of its most decisive contentions, AWI's case contained a notable absence of Maine-generated, lynx-specific studies.  It relied instead on extrapolations from studies about other animals in different regions to prove contentions about the lynx in Maine.

The same general point applies to Dr. Paquet and Ms. Fox.  Dr. Paquet is certainly an expert, but he acknowledged that most of his work has been with coyotes and wolves, with bears, and with lynx in descending order.  *Trial Tr.* 209:9-12.  He has had limited direct contact with the state of Maine, and with lynx in the State.  Although Ms. Fox has had some direct experience in Maine as a participant in the Maine Wolf Inquiry Project in the summer and fall of 2008, the Court has a sense of disquiet about the extent to which Ms. Fox was testifying as an objective expert as opposed to an educated advocate.[17]  *Id.* 298:8-16.  But, neither Dr. Paquet nor Ms. Fox's level of expertise about Canada lynx in Maine compares favorably with Dr. Elowe's long term, in depth, professional knowledge of wildlife in the state of Maine, including lynx.  Dr. Elowe has been employed by IF&W since 1988, and has been responsible for all mammals since 1990.  *Id.* 545:25; 546:1-25; 547:1-4.  To the extent the case has been a battle of the experts, the Court has relied on Dr. Elowe's testimony over the testimony of both Dr. Paquet and Ms. Fox.

Even where AWI addressed Maine-generated, lynx-specific data, AWI relied on *ex post facto propter hoc* reasoning, inferring that because a lynx died after being trapped, the trapping must have caused its death.  This is admittedly a difficult area.  Dr. Elowe confirmed that of the thirty lynx caught in leghold traps between 1999 and 2006, IF&W radio-collared six, three of

---

[17] The Court respects Ms. Fox's intelligence and commitment, but is concerned that her opinions as an expert were colored by her strongly held personal views.  Ms. Fox was involved in the decision to initiate API's 2006 litigation. *AWI I*, 588 F. Supp. 2d at 87.  When she testified in this case, the Court was forced to repeatedly admonish Ms. Fox to answer the questions asked, not to advocate.  At times while testifying, Ms. Fox seemed more like an attorney, presenting an under oath closing argument for AWI's side.

whom died within six months of being trapped.  *Trial Tr.* 716:5-22.  Two died of unconfirmed

causes.  *Id.* 716:23-24.  Dr. Elowe allowed that these two lynx could have been killed by a

predator, but when asked whether the trapping experience could have caused the lynx to be more

susceptible to predation, he could only state that he did not know.  *Id.* 717:22-25.  Similarly,

IF&W records reflected that a lynx was trapped on March 27, 2007 and again on September 5,

2008, and during the eighteen month interval, its weight went from 23 pounds, which is healthy,

to 15 pounds, which is close to starvation.  *Id.* 730:8-25; 731:1-9; *Def.'s Ex.* 49.  It died on

November 14, 2008.  *Trial Tr.* 730:16-18.

AWI pressed Dr. Elowe as to whether the death of seven lynx within six months of being

captured would constitute empirical data of a causal link between the trapping and the death.

*Trial Tr.* 734:18-20.  Dr. Elowe replied that the data would support such a link "[o]nly if you

could attach a causal factor to it."  *Id.*  Dr. Elowe explained the difficulty:

> I think healthy lynx, as well as - - as sickly lynx are taken by predators, and it
> seems like we have very healthy lynx taken just as much as - - as lynx that may
> not be healthy.  So the likelihood of it happening - - the likelihood of drawing a
> conclusion that because it was killed by a fisher or some other predator, that it
> was somehow weakened, in a predisposed state, is not a causal factor we can
> make the jump to.

*Id.* 717:11-18.

As the Court interprets these interchanges, since lynx that have not been trapped can die

of predation and starvation, the fact that a lynx that had been trapped later died of predation or

starvation does not mean the trapping caused or contributed to the death.  Even assuming there

may have been some incremental, but unmeasured debilitating impact from the trapping, whether

a fisher would have caught and killed the lynx, but for incremental impact is unknown and

perhaps unknowable.  From its advocacy viewpoint, it is understandable that AWI sees a causal

connection between the time of the trapping and the animal's death.  But, like Dr. Elowe, the Court cannot make the jump to the same conclusion.

The Court finds AWI's generic evidence and speculative inferences much less convincing than IF&W's specific records and finds Dr. Elowe's testimony more convincing than the opinions of either Dr. Paquet or Ms. Fox.  *See Winter*, 129 S. Ct. at 375 (stating that "[o]ur frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction); *American Bald Eagle*, 9 F.3d at 167 n.5 (observing that the plaintiffs had the burden of proof in an ESA claim on their motion for permanent injunction); *Strahan v. Holmes*, 595 F. Supp. 2d 161 (D. Mass. 2009) (denying a motion for permanent injunction in an ESA claim because the plaintiff failed to sustain his burden to demonstrate irreparable harm).

Moreover, even if the Court found that some lynx suffer debilitating injuries from being captured in leghold traps, it cannot take the next step and conclude that those injuries represent a threat to the species as a whole.  *Water Keeper*, 271 F.3d at 34 (stating that "[i]n the absence of a more concrete showing of probable deaths during the interim period and of how these deaths may impact the species, the district court's conclusion that Water Keeper has failed to show potential for irreparable harm was not an abuse of discretion").  AWI has simply not proven its case.

### 4.      Irreparable Injury Conclusion

The Court has analyzed each of the disputed factual contentions in much the same way. AWI bears the burden of proof, and simply put, it has failed to convince the Court that its view of the evidence is more likely than not; AWI has failed to satisfy the irreparable harm prong of the injunction standard.

III.    CONCLUSION

The Court need go no further.[18]  The Court concludes that Animal Welfare Institute and the Wildlife Alliance of Maine failed to sustain their burden of proof to demonstrate that the Canada lynx will suffer irreparable harm if an injunction against the state of Maine does not issue.  The Court DENIES the Plaintiffs' request for permanent injunction.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 10th day of November, 2009

---

[18] The parties have raised other significant issues.  IF&W questions the Court's authority under the Tenth Amendment to enforce a federal statute against the state of Maine.  *See AWI I*, 588 F. Supp. 2d at 100-101.  The Trappers in particular contend that following *Winter*, the Court has the authority to balance the Trappers' economic interests against the harm to the protected species and to balance the impact of AWI's proposed additional trapping restrictions on the prevalence of fisher, marten and other lynx predators and the increased vulnerability of lynx to predation.  *See Winter*, 129 S. Ct. 365; *Animal Protection Institute*, 511 F. Supp. 2d 196, 198 (D. Me. 2007); *see generally* Lisa Lightbody, Comment, *Winter v. Natural Resources Defense Council, Inc.*, 33 Harv. Envtl. L. Rev. 593 (2009).  In view of the Court's conclusion that AWI failed to demonstrate the lynx as a species will suffer irreparable harm if the injunction is not granted, the Court does not reach these additional concerns.